PEOPLE v MACKLE

Docket No. 204299. Submitted June 14, 2000, at Detroit. Decided June 30, 2000, at 9:00 A.M. Leave to appeal sought.

Patrick J. Mackle was convicted by a jury in the Oakland Circuit Court, Fred M. Mester, J., of one count of kidnapping and twelve counts of first-degree criminal sexual conduct (six of the counts alleged personal injury to the victim and force or coercion used to accomplish sexual penetration, and the other six counts alleged sexual penetration occurring during the commission of a felony). The offenses involved a single victim who against her will was allegedly confined and raped by the defendant in Michigan and Canada over several days. Before being extradited by Canada to Michigan, the defendant completed a prison sentence in Canada imposed for convictions that included unlawful confinement and sexual assault. The defendant appealed his Michigan convictions.

The Court of Appeals *held*:

1. The defendant's claim that his extradition violated Article 4 of the extradition treaty between the United States and Canada, 27 UST 983; TIAS 8237, should have been made in a Canadian court, not a Michigan court. Article 4 provides that extradition shall not be granted where the requesting state seeks the surrender of a person who was previously tried and punished in the requested state for the offense for which extradition is requested. Article 4 imposes a limitation on the requested state rather than on the requesting state. Furthermore, under Article 8, the determination whether extradition should be granted must be made in accordance with the law of the requested state and the person whose extradition is sought shall have the right to use all remedies and resources provided by such law. Thus, the defendant's right to resist extradition was a matter for a Canadian court.

2. The defendant's right under Const 1963, art 1, § 15 not to be twice put in jeopardy for the same offense was not violated upon his conviction in Michigan of kidnapping after having sustained a Canadian conviction of unlawful confinement. The Double Jeopardy Clause prohibits a second prosecution for an offense arising out of the same criminal act unless it appears from the record that the interests of the state of Michigan and the jurisdiction that ini-

tially prosecuted are substantially different. Assuming, without deciding that the Michigan kidnapping statute, MCL 750.349; MSA 28.581, and the Canadian unlawful-confinement statute, RSC 279(2)(1)(a)-(b), proscribe the same offense, there is no double jeopardy violation in view of the different maximum penalties, the substantive differences in elements, and the different interests vindicated.

4. The six counts of first-degree criminal sexual conduct involving personal injury were supported by sufficient evidence of bodily injury or mental anguish to the victim.

5. The defendant's conviction of twelve counts of first-degree criminal sexual conduct violated double jeopardy protections against multiple punishments for the same offense, US Const, Am V; Const 1963, art 1, § 15. The prosecution alleged six acts of sexual penetration supported by alternative theories of personal injury or sexual penetration occurring during the commission of a felony. The matter must be remanded so that the trial court can amend the judgment of sentence to reflect that alternative theories supported six counts of first-degree criminal sexual conduct, and so that the trial court can vacate six of the twelve sentences for first-degree criminal sexual conduct.

6. The defendant's right to a speedy trial under US Const, Ams VI and XIV; Const 1963, art 1, § 20; MCL 768.1; MSA 28.1024 was not violated when his extradition did not take place until he completed his Canadian sentence. Although the seven-year delay was substantial, there was no violation of the right to a speedy trial because there was good reason for the delay (Canada's exercise of its discretionary right under Article 7 not to surrender a person whose extradition is sought until the full execution of a Canadian sentence) and the defendant did not contend that he suffered prejudice from the delay.

7. The rule that a prosecutor must make a good-faith effort to bring a person imprisoned in Michigan to trial on an outstanding charge, MCL 780.131; MSA 28.969(1); MCR 6.004(A) and (D), was not violated because it does not apply to the defendant, who was imprisoned in Canada, not in Michigan.

Affirmed, but remanded for amendment of judgment of sentence.

1. TREATIES — EXTRADITION TREATY BETWEEN THE UNITED STATES AND CANADA — SAME OFFENSE.

The extradition treaty between the United States and Canada prohibits the extradition of a person whose surrender is sought for an offense for which the person has been tried and discharged or punished in the territory of the requested state; a person who seeks to challenge an extradition as being in violation of such prohibition

must make the challenge in a court of the requested state, not the requesting state (27 UST 983; TIAS 8237).

2. CONSTITUTIONAL LAW — DOUBLE JEOPARDY.

The Double Jeopardy Clause of the Michigan Constitution prohibits a second prosecution for an offense arising out of the same criminal act unless it appears from the record that the interests of the state of Michigan and the jurisdiction that initially prosecuted are substantially different; factors bearing on the question include an analysis of whether the respective maximum penalties are greatly disparate, whether some reason exists why one jurisdiction cannot be entrusted to vindicate fully another jurisdiction's interest in securing a conviction, and whether the differences in the statutes are merely jurisdictional or are more substantive (Const 1963, art 1, § 15).

3. RAPE — FIRST-DEGREE CRIMINAL SEXUAL CONDUCT — PERSONAL INJURY.

Personal injury, for purposes of the statute that makes it first-degree criminal sexual conduct to cause personal injury to the victim while using force or coercion to accomplish sexual penetration, includes bodily injury and mental anguish; mental anguish is established with proof that the victim experienced extreme or excruciating pain, distress, or suffering of the mind (MCL 750.520b[1][f]; MSA 28.788[2][1][f]).

4. CRIMINAL LAW — SPEEDY TRIAL.

Four factors must be balanced when determining whether a defendant has been denied the constitutional and statutory right to a speedy trial: the length of the delay, the reasons for the delay, whether the defendant asserted the right to a speedy trial, and prejudice to the defendant from the delay (US Const, Ams VI and XIV; Const 1963, art 1, § 20; MCL 768.1; MSA 28.1024).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *David G. Gorcyca*, Prosecuting Attorney, *Daniel L. Lemisch*, Chief, Appellate Division, and *John S. Pallas*, Assistant Prosecuting Attorney, for the people.

*Neil J. Leithauser*, for the defendant.

Before: O'CONNELL, P.J., and KELLY and WHITBECK, JJ.

O'CONNELL, P.J. In this case, a jury convicted defendant of twelve counts of first-degree criminal sexual conduct (CSC I), MCL 750.520b(1); MSA 28.788(2)(1), and one count of kidnapping, MCL 750.349; MSA 28.581. The trial court sentenced defendant to fifteen to thirty years' imprisonment, with credit for 2,799 days served, for kidnapping and to the same sentence for each CSC I count. On appeal as of right, defendant contends that the evidence adduced at trial was insufficient to support his conviction under MCL 750.520b(1)(f); MSA 28.788(2)(1)(f) (the "personal injury" variety of CSC I), and that his CSC I and kidnapping convictions cannot withstand double jeopardy analysis. Defendant further argues that his extradition to Michigan from Canada violated a treaty between the United States and Canada, as well as his right to a speedy trial. We affirm, but remand to the trial court with instructions to amend the judgment of sentence.

I

Complainant testified at trial that she met defendant in April 1989 and that a relationship thereafter ensued. She understood that defendant developed property, promoted a rock band, and produced movies. According to complainant, she ended the relationship in September 1989, but defendant persistently attempted to remain in touch with her. Complainant agreed to meet him in a restaurant on October 5, 1989. At that meeting, complainant told defendant that she did not want to pursue the relationship further.

Complainant testified that defendant was initially calm and polite that night, but that after dinner, in the

restaurant parking lot, defendant pulled her out of her car and shoved her into his own. Defendant insisted on continuing the conversation and began driving, over her objections. When complainant struggled, defendant pulled over, tied her hands, then continued to drive. According to complainant, she continued to struggle, and defendant continued to subdue and constrain her until they reached a motel in Port Huron. Defendant told her that he was taking her to see some of his Mafia friends.

Complainant testified that at the motel, over her further objections and resistance, defendant had sexual intercourse with her while her hands were tied. According to complainant, she tried to leave the room, but defendant restrained her, bound her ankles with neckties, and tied her wrist to his own. The following morning defendant announced that he was going to have sex with her again. When she resisted, he repeatedly struck her with an open hand and then forced her to have intercourse. Afterward, the two argued furiously, and defendant responded by strangling her with a necktie for a minute or two. Defendant again forced her to endure sexual intercourse. Complainant observed that defendant seemed to derive heightened pleasure from her resistance.

Early in the afternoon, defendant tied complainant's hands and placed her back in his vehicle. Defendant later untied her and allowed her to eat some pizza, at which time he informed her that he would take her to see some Mafia members, with whom she would remain until she agreed to marry him. Complainant testified that she then tried to leave the vehicle, but that defendant tied her up again and put her in the back seat. Defendant also punched her leg and

slapped her face. He continued to drive around town until approximately 5:00 P.M., when he pulled behind a building, penetrated her digitally, and then pushed her legs apart and performed cunnilingus.

Afterward, defendant drove to another motel in Port Huron and obtained a room. Once inside, defendant told complainant that if she "behaved," he would take her home in the morning. Complainant reported that defendant then asked her to perform oral sex on him, which she did, believing her freedom depended on it. Afterward, defendant informed complainant that if she became pregnant with his child, he would terminate the pregnancy by punching her in the abdomen. In the course of this discussion, defendant became angry and forced complainant into a sauna that was in the room and turned it to its highest setting. He knew that she was claustrophobic. Defendant became frustrated when the sauna failed to function properly, so he pulled her out, threw her onto the bed, and then forced her to have intercourse.

Complainant testified that defendant informed her that he was going to arrange for the Mafia to pick up and kill a member of her family. He later took her to a restaurant, but admonished her not to cause trouble. According to complainant, the two brought the food back to the room, whereupon complainant discovered a steak knife in the package and tried to attack defendant with it, but defendant overpowered her.

The morning of the next day, October 7, defendant again tied complainant up and forced her to have intercourse. Defendant learned later in the day that complainant's father had asked the police to search for her. Defendant then insisted that complainant

make a call to quell the investigation. Defendant threatened to direct a Mafia member to kill her son, so complainant called defendant's mother and encouraged her to telephone complainant's father and pass on an innocent explanation concerning her whereabouts.

Afterward, defendant put complainant in his vehicle, spent some time driving around, and then informed her that because of the possibility of a missing person investigation in the United States, he had made arrangements to have Mafia members pick her up in Canada. He ordered her to drive across the border because he lacked a valid driver's license. Under the pressure of threats to her son's life, complainant drove across the border without incident.

Complainant testified that she remained with defendant in Canada from that afternoon until she escaped on October 12. During this time, they remained in Canada and stayed in a different motel every night. Defendant continuously forced her to engage in sexual intercourse with him. She recounted finally leaving the motel by herself early in the morning of October 12. Complainant explained that defendant told her that Mafia members were going to kill her within a few days, and that he removed her jewelry to make her body difficult to identify. She was able to free herself while defendant slept. She left the motel in defendant's vehicle and called the police, and also her family, from a nearby truck stop.

A Canadian court tried and convicted defendant in connection with the events occurring in Canada, and defendant served a sentence of at least five years in a Canadian prison. On the expiration of defendant's

Canadian sentence, the Oakland County prosecutor secured defendant's extradition for trial in Michigan.

II

Defendant first argues that, given his conviction and sentence in Canada, his subsequent prosecution in Oakland County violated the Treaty of Extradition between the United States of America and Canada, 27 UST 983; TIAS 8237, as well as the double jeopardy prohibition of Const 1963, art 1, § 15. We first address defendant's contention that his subsequent prosecution in Michigan violated the extradition treaty. An interpretation of language contained in a treaty involves a question of law. *Piamba Cortes v American Airlines, Inc*, 177 F3d 1272, 1280 (CA 11, 1999); *Cook v United States*, 86 F3d 1095, 1097 (Fed Cir, 1996); *Wickman v Vinco Corp*, 288 F2d 310, 312 (CA 6, 1961). We review questions of law de novo. *People v Melotik*, 221 Mich App 190, 198; 561 NW2d 453 (1997).

The fourth article of the treaty, in relevant part, provides:

> (1) Extradition shall not be granted in any of the following circumstances:
>
> (i) When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished in the territory of the requested state for the offense for which his extradition is requested.

Defendant contends that the Oakland County prosecutor violated this provision when he sought defendant's extradition from Canada for trial on the CSC I and kidnapping charges.

Under US Const, art VI, cl 2, a treaty entered into under the authority of the United States is the "the supreme Law of the Land" to which "the Judges in every State shall be bound . . . ." As the United States Supreme Court has noted, the "treaties of the United States are as much a part of the law of every State as its own local laws and Constitution." *Hauenstein v Lynham*, 100 US 483, 490; 25 L Ed 628 (1879). Therefore, the courts of this state must take judicial notice of any treaties of the United States and enforce the rights granted therein in an appropriate proceeding. *United States v Rauscher*, 119 US 407, 419; 7 S Ct 234; 30 L Ed 425 (1886).

However, a Michigan court was not the proper forum for defendant to vindicate any rights granted to him in the treaty. Article 4 provides that extradition "shall not be *granted*" where, as here, the requesting state seeks the surrender of a person who was previously tried and punished in the requested state "for the offense for which his extradition is requested." 27 UST 983, art 4(1)(i) (emphasis added). This language implies that a defendant should seek to preserve the defendant's rights under Article 4 in an appropriate tribunal of the requested country (the country that would do the *granting*), rather than the requesting country (as would be the case if the treaty stated that "extradition shall not be *sought*"). As such, the treaty imposed a limitation on the requested state, rather than the requesting state.

Article 8 of the treaty further supports our conclusion where it states that "the determination that extradition should or should not be granted shall be made in accordance with the law of the *requested* State and the person whose extradition is sought

shall have the right to use all remedies and recourses provided by such law" (emphasis added). According to this language, a determination whether the Oakland County prosecutor sought to extradite defendant for the same offenses for which the Ontario court tried and convicted him was a matter of Canadian law. Further, a Canadian court would have been in a far better position to rule on issues arising under Canadian law than would a court of our state. Therefore, we conclude that defendant's right to resist extradition was a matter for a Canadian tribunal, rather than one of our state, to resolve.

III

We next turn to defendant's contention that his prosecution in Michigan, after his trial and conviction in Canada, violated the double jeopardy prohibition of the Michigan Constitution. We review double jeopardy questions de novo. *People v Walker*, 234 Mich App 299, 302; 593 NW2d 673 (1999). The Double Jeopardy Clauses of the federal and state constitutions prohibit a criminal defendant from being placed twice in jeopardy for a single offense. *United States v Jorn*, 400 US 470, 479; 91 S Ct 547; 27 L Ed 2d 543 (1971); *People v Burks*, 220 Mich App 253, 256; 559 NW2d 357 (1996).

Our review of the record indicates that the Oakland County prosecutor's charges of kidnapping and CSC I corresponded to the events that occurred in Michigan exclusively. Similarly, defendant's Ontario trial and conviction involved only the acts that defendant committed in the town of Milton, Ontario. Crown counsel charged defendant with counts of unlawful confinement, sexual assault, choking complainant to enable

him to commit sexual assault, uttering a death threat, and unlawful possession of complainant's jewelry. Consequently, the Oakland County prosecutor did not seek to extradite defendant for the same offenses for which the Ontario court convicted and sentenced him, with one possible exception.

Only the Ontario conviction of unlawful confinement and the Michigan conviction of kidnapping raise double jeopardy concerns. In a multiple-prosecution case where one or more of the two offenses do not contain a specific criminal intent as an element, to determine whether the two convictions were for the same "offense," we look to whether they arose out of the same criminal episode or transaction and violated laws that sought to prevent a similar type of harm. *Crampton v 54-A Dist Judge*, 397 Mich 489, 502; 245 NW2d 28 (1976); *People v Hunt (After Remand)*, 214 Mich App 313, 315-316; 542 NW2d 609 (1995). In this case, defendant's act of confining complainant against her will was continuous throughout the relevant period, and both statutes sought to prevent a similar harm (unlawful confinement). In lieu of engaging in a detailed review of Canadian law, we assume, but do not decide, that they were the same offense for purposes of our Michigan double jeopardy analysis.

Our state constitution affords broader protection against double jeopardy than does the federal constitution.[1] *People v Harrington*, 194 Mich App 424, 428;

---

[1] Defendant does not rely on the federal constitution, apparently because the United States Supreme Court opinions embrace the "dual sovereignty" doctrine. Under this doctrine, successive state and federal prosecutions for the same offense do not violate the Double Jeopardy Clause of the Fifth Amendment of the federal constitution. *Heath v Alabama*, 474 US 82, 88; 106 S Ct 433; 88 L Ed 2d 387 (1985); *Abbate v United States*, 359 US 187, 195-196; 79 S Ct 666; 3 L Ed 2d 729 (1959); *Bartkus v Illinois*,

487 NW2d 479 (1992). In the context of prosecutions involving separate sovereigns, Michigan courts interpret Const 1963, art 1, § 15 to prohibit "a second prosecution for an offense arising out of the same criminal act unless it appears from the record that the interests of the State of Michigan and the jurisdiction which initially prosecuted are substantially different." *People v Cooper*, 398 Mich 450, 461; 247 NW2d 866 (1976). See also *People v Childers*, 459 Mich 216, 219; 587 NW2d 17 (1998). The factors bearing on the question include an analysis of whether the respective maximum penalties are greatly disparate, and whether "some reason exists why one jurisdiction cannot be entrusted to vindicate fully another jurisdiction's interests in securing a conviction, and whether the differences in the statutes are merely jurisdictional or are more substantive." *Cooper, supra* at 461.

The Michigan kidnapping statute provides as follows:

> Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be

---

359 US 121, 136-138; 79 S Ct 676; 3 L Ed 2d 684 (1959). A number of federal courts have extended this doctrine to federal prosecutions following foreign convictions. See, e.g., *United States v McRary*, 616 F2d 181, 185 (CA 5, 1980); *United States v Richardson*, 580 F2d 946, 947 (CA 9, 1978); *United States v Galanis*, 429 F Supp 1215, 1226 (D Conn, 1977).

guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years.

Every offense mentioned in this section may be tried either in the county in which the same may have been committed or in any county in or through which the person so seized, taken, inveigled, kidnaped or whose services shall be sold or transferred, shall have been taken, confined, held, carried or brought; and upon the trial of any such offense, the consent thereto of the person, so taken, inveigled, kidnaped or confined, shall not be a defense, unless it shall be made satisfactorily to appear to the jury that such consent was not obtained by fraud nor extorted by duress or by threats. [MCL 750.349; MSA 28.581.]

The relevant Canadian legislation reads, in pertinent part, as follows:

Every one who, without lawful authority, confines, imprisons or forcibly seizes another person is guilty of

(a) an indictable offence and liable to imprisonment for a term not exceeding ten years; or

(b) an offence punishable on summary conviction and liable to imprisonment for a term not exceeding eighteen months. [RSC 279(2)(1)(a)-(b).]

The Michigan kidnapping statute sets forth several theories to support a conviction of kidnapping. *People v Wesley*, 421 Mich 375, 383-384; 365 NW2d 692 (1984). The Oakland County prosecutor alleged forcible confinement, malicious intent, and asportation within the state. Thus, defendant's Michigan conviction required both malicious intent and asportation. See *Wesley*, *supra* at 385-386. Neither of these elements appear in the Canadian statute. The statutes also differ in that they provide widely disparate maximum penalties. The Michigan kidnapping statute authorizes life imprisonment, whereas the Canadian

unlawful-confinement statute provides for a maximum of ten years.

Further, the additional elements involved with the Michigan kidnapping statute address a substantive, not merely jurisdictional, difference from the Canadian unlawful-confinement statute. We also note that the Canadian authorities prosecuted defendant under the Canadian unlawful-confinement statute, not the kidnapping statute that precedes it, RSC 279(1). That the Canadian authorities eschewed the latter, which much more closely resembled the Michigan kidnapping statute, reflects a determination to vindicate Canadian interests exclusively, and to defer the prosecution for kidnapping to the jurisdiction in which the kidnapping began. Defendant's subsequent prosecution for kidnapping, therefore, did not violate the double jeopardy prohibition of the Michigan Constitution.

IV

We next address defendant's assertion that the prosecutor failed to produce sufficient evidence to satisfy the "personal injury" element of MCL 750.520b(1)(f); MSA 28.788(2)(1)(f), which establishes that an actor is guilty of CSC I if "[t]he actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration." Personal injury for purposes of this legislation includes bodily injury or mental anguish, and physical injuries for this purpose need not be permanent or substantial. *People v Himmelein*, 177 Mich App 365, 376-377; 442 NW2d 667 (1989). To prove mental anguish, "the prosecution is required to produce evidence from which a rational trier of fact could conclude, beyond a reasonable

doubt, that the victim experienced extreme or excruciating pain, distress, or suffering of the mind." *People v Petrella*, 424 Mich 221, 259; 380 NW2d 11 (1985). In reviewing this issue, we must view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. *People v Johnson*, 460 Mich 720, 722-723; 597 NW2d 73 (1999).

Defendant cites *People v Payne*, 90 Mich App 713; 282 NW2d 456 (1979), for the proposition that an injury that supports one instance of CSC I cannot support additional counts stemming from subsequent penetrations. In *Payne*, this Court ruled that where a beating supported an initial act of CSC I, that beating could not satisfy the personal injury element, for purposes of CSC I, of subsequent forcible penetrations. *Id.* at 718. *Payne* is not binding on this panel. See MCR 7.215(H)(1).[2]

In *People v Martinez*, 190 Mich App 442, 445; 476 NW2d 641 (1991), however, this Court held that an initial assault may by itself satisfy the personal injury element of several penetrations occurring within ten minutes of the assault, where "there was no indication of the defendant's intention to discontinue the attack during the entire episode." See also *People v Hunt*, 170 Mich App 1, 8; 427 NW2d 907 (1988) ("The beating visited upon the complainant immediately prior to the *series* of sexual penetrations is sufficient to supply the element of personal injury with respect to each of the subsequent penetrations so as to sup-

---

[2] MCR 7.215(H)(1) only requires us to follow the rule of law established in a published opinion issued on or after November 1, 1990.

port multiple convictions under MCL 750.520b(1)(f); MSA 28.788(2)(1)(f)." [emphasis added].)

This case presents us with the question whether any of the alleged penetrations were not simultaneously accompanied by personal injury, and, if so, whether those penetrations occurred under circumstances that nonetheless connected them with personal injury that occurred earlier in the course of the victim's ordeal. The prosecution introduced photographs indicating that complainant suffered cuts and bruises, but we cannot determine from the trial record which injuries were attributable to the events in Michigan, and which occurred in Canada. We must therefore examine complainant's testimony regarding each incident.

Complainant testified that before the first alleged penetration, defendant stated that he was going to deliver her to his Mafia connections in New York, and that complainant believed him. Complainant also reported that defendant tied her hands so tightly that her fingers went numb. Defendant then forced her legs apart to achieve vaginal penetration. This evidence was sufficient to support a finding that complainant was subjected to both personal injury and mental anguish in connection with the first penetration.

With respect to the second penetration, complainant testified that defendant overcame her resistance by repeatedly striking her with an open hand, and again forcing her legs apart and penetrating her vaginally. The open-hand slaps supported a finding of physical injury. See *People v Kraai*, 92 Mich App 398, 402-403; 285 NW2d 309 (1979).

Before the third penetration, defendant wrapped a necktie around complainant's throat that prevented her from breathing. When defendant stopped strangling her, he again forced her to endure sexual intercourse. The degree of strangulation that complainant reported supports a finding that she suffered bodily injury. See *Kraai, supra* at 402-403. Further, complainant felt that defendant derived amusement from overpowering her, which also supported a finding that she suffered humiliation, or suffering of the mind.

We also conclude that the evidence was sufficient to support a finding that complainant was subjected to personal injury in connection with the fourth penetration. Complainant testified that after the third penetration, defendant continued his threat to turn her over to the Mafia and that he hurt her when he struck her on the leg with his fist and slapped her in the face at least twice. Defendant then drove her in his car and parked it behind a building, where he penetrated her digitally and performed cunnilingus on her. The events leading up to this sex act supported a finding of both bodily harm and mental anguish.

Complainant testified that before the fifth penetration, defendant left her tied up and strapped to his vehicle while he registered for a motel room. Once in the room, defendant told her that if she "behaved," he would take her home the next morning. Complainant reported that, after about twenty minutes in the room, defendant then asked her to perform oral sex on him, which she did. Complainant emphasized that she did so because she thought she was bargaining for her freedom. Defendant thus reduced complainant to the role of a beggar. In our view, a rational trier of

fact could conclude that defendant's conditioning complainant's freedom, if not her life, on her performing a sexual act caused her distress and suffering of the mind sufficient to satisfy the personal injury element. Further, our reading of *Hunt* and *Martinez*, *supra*, indicates that we need not consider an act of penetration in isolation. With respect to this fifth penetration, we cannot ignore that this act occurred against a backdrop of ongoing physical violence and psychological torment.

According to complainant, the events preceding the sixth penetration included arguing and defendant's repeated threat to leave complainant a captive of the Mafia, threatening her with a raised fist, and trapping her in a small sauna bath for fifteen to twenty minutes despite knowing that she was claustrophobic. Afterward, defendant pulled her out of the sauna, threw her onto the bed, and forced her to have intercourse. At the very least, complainant's suffering of the Mafia threat, and being forced to confront her claustrophobia for a quarter hour, was evidence of mental anguish, and hence personal injury.

V

The prosecutor alleged that defendant committed six acts of sexual penetration, charged him with six counts of CSC I, and set forth alternative theories to support each: MCL 750.520b(1)(c); MSA 28.788(2)(1)(c) (sexual penetration occurring during the commission of a felony) and MCL 750.520b(1)(f); MSA 28.788(2)(1)(f) (actor uses force or coercion to accomplish the sexual penetration and the victim suffers physical injury). Notwithstanding the fact that the prosecutor alleged only six acts of sexual penetra-

tion, the jury convicted defendant of twelve counts of CSC I. Defendant asserts that the twelve convictions constituted multiple punishments for the same offense in violation of double jeopardy, US Const, Am V; Const 1963, art 1, § 15. We agree.

The double jeopardy prohibition includes subjecting a defendant to multiple punishments for a single offense. *Witte v United States*, 515 US 389, 395-396; 115 S Ct 2199; 132 L Ed 2d 351 (1995); *People v Wilson*, 454 Mich 421, 427; 563 NW2d 44 (1997). In this case, the jury convicted defendant twice for each instance of sexual penetration.

In *People v Bigelow*, 229 Mich App 218; 581 NW2d 744 (1998), this Court concluded that separate convictions and sentences for both premeditated murder and felony murder, both of which arose from a single instance of criminal conduct, violated the rule against double jeopardy. *Id.* at 220. The Court remedied the double jeopardy problem by directing the lower court to amend the judgment of sentence to reflect a single conviction and a single sentence for a crime that was supported by two separate theories. *Id.* at 221-222. We likewise remand this case to the trial court so that it may amend the judgment of sentence specifically to reflect that two alternate theories supported each of the six counts of CSC I. Accordingly, we further direct the trial court to vacate six of defendant's twelve sentences for CSC I.

VI

Defendant's final argument is that the prosecution deprived him of his right to a speedy trial in not securing defendant's extradition until after he served

his sentence in Canada. From what we are able to ascertain from the record, the United States initiated extradition procedures in 1989, but the Oakland County prosecutor did not finally arrange for defendant's extradition until April 1996, after defendant served his Canadian sentence.

A criminal defendant has a constitutional and statutory right to a speedy trial. US Const, Ams VI and XIV; Const 1963, art 1, § 20; MCL 768.1; MSA 28.1024. See also MCR 6.004(A). "In determining whether a defendant has been denied a speedy trial, four factors must be balanced: (1) the length of the delay, (2) the reasons for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) prejudice to the defendant from the delay." *People v Levandoski*, 237 Mich App 612, 620, n 4; 603 NW2d 831 (1999), citing *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972). Speedy trial claims raise constitutional issues that we review de novo. *People v Cain*, 238 Mich App 95, 108; 605 NW2d 28 (1999).

In this case, the delay between the events underlying defendant's conviction and his extradition was approximately seven years. We consider the length of this delay substantial. The reasons for the delay, however, mitigate our concerns about its length. The court below noted that the Ontario court ordered that defendant's surrender occur only after defendant's full parole or release from imprisonment.

Article 7 of the extradition treaty provides as follows:

> When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for

which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

In dicta contained in *People v Donaldson*, 103 Mich App 42, 46; 302 NW2d 592 (1981), this Court remarked that the treaty does not require Canada to consent to a defendant's extradition until after the completion of any validly imposed Canadian sentence. The treaty involved in the present case, however, did not apply in *Donaldson* because the underlying facts in the case occurred before the effective date of the treaty. This Court therefore engaged in an interpretation of both a Canadian statute and the predecessor to the treaty at issue in this case, the Webster-Ashburton Treaty of 1984, 8 Stat 572; TS 119, as supplemented by the Convention of 1889 between the United States and Great Britain, 26 Stat 1508; TS 139. The Canadian statute, made applicable under the terms of the Webster-Ashburton treaty, mandated that a Canadian jurisdiction not surrender a person for extradition until after the person was acquitted or his sentence expired. *Donaldson, supra* at 47. This Court stated:

> Under these circumstances, we are not inclined to hold that the prosecutor was obligated to seek extradition of defendant before expiration of his Canadian sentence. There was no failure to afford a speedy trial in this case, where the prosecutor moved for a trial promptly after the return of defendant to Michigan. [*Id.*]

In this case, the Ontario authorities availed themselves of their discretion under Article 7 of the treaty not to surrender defendant until after defendant's full

parole or release from imprisonment in Canada. The Oakland County prosecutor secured defendant's extradition after his release in 1996. In our view, the instant case is indistinguishable from *Donaldson*. We are mindful that Michigan prefers the speedy administration of justice. However, the interests of justice do not militate in favor of Michigan's taking steps to truncate or otherwise interfere with a Canadian court's execution of its own criminal sentence. Further, defendant does not contend that the delay prejudiced his ability to put on a defense or deprived him of any civil liberties.[3] We conclude that the prosecution did not deprive defendant of his right to a speedy trial.[4]

---

[3] Defendant asserts that he served his full sentence, instead of being paroled, in part because he declined to take advantage of rehabilitative services for fear that his participation would create evidence that might be used against him in Michigan. However, rehabilitative services in prison are a privilege, not the prisoner's right. See *People v Malmquist*, 155 Mich App 521, 525-526; 400 NW2d 317 (1986). As concerns defendant's Canadian incarceration, he made a strategic decision not to avail himself of the privilege of sex-offender services. That defendant, by engaging in a course of criminal behavior that involved Canada as well as Michigan, placed himself in a position where he felt it best not to talk candidly about his crimes while incarcerated in Canada, simply does not persuade us to find that he suffered prejudice attributable to this state.

[4] In the course of his argument, defendant asserts that the Interstate Agreement on Detainers (IAD), MCL 780.601 *et seq.*; MSA 4.147(1) *et seq.*, provides that prisoners are protected against unreasonable delays. Defendant does not assert, let alone explain, that the agreement applies to Canada. A party may not merely state a position and then leave it to this Court to discover and rationalize the basis for the claim. *In re Hamlet (After Remand)*, 225 Mich App 505, 521; 571 NW2d 750 (1997); *In re Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992). Similarly, "[a] party may not leave it to this Court to search for authority to sustain or reject its position." *In re Keifer*, 159 Mich App 288, 294; 406 NW2d 217 (1987). Further, defendant did not state a claim under the IAD as a question raised on appeal, thus waiving it for appellate consideration. *Meagher v McNeely & Lincoln, Inc*, 212 Mich App 154, 156; 536 NW2d 851 (1995). See also MCR 7.212(C)(5). We therefore decline to consider the issue.

Finally, defendant raises the 180-day rule of MCL 780.131; MSA 28.969(1), and MCR 6.004(A) and (D). The statutory version of the rule concerns "an untried warrant, indictment, information, or complaint setting forth against any inmate of a correctional facility *in this state* . . . ." MCL 780.131(1); MSA 28.969(1)(1) (emphasis added). Clearly defendant's incarceration in Canada does not implicate this legislation. Turning to the court rule, MCR 6.004(A) states only the general principle that both parties in criminal actions are entitled to a "speedy resolution of all matters before the court," and subrule (D)(1) states that the prosecutor must make a "good faith effort to bring a criminal charge to trial within 180 days . . . ." Subrules (D)(1)(a) and (b), however, establish that the rule applies to persons incarcerated in a "state prison" or detained in a "local facility." The court rule thus also has no application to a prisoner serving a sentence in a foreign country.

Affirmed but remanded for amendment of the judgment of sentence. We do not retain jurisdiction.

WHITBECK, J., concurred.

KELLY, J., concurred in the result only.

---

Defendant similarly points to Article 4(1)(ii) of the extradition treaty with Canada, which provides that extradition will not be granted "[w]hen the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State." However, defendant does not allege that the period of limitation had run for the Michigan offenses. Defendant also did not include the treaty question in his statement of the issue. We decline to address this question as well. Moreover, as we stated earlier in this opinion, defendant should have raised this issue in a Canadian tribunal.