*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee

v

DANIEL ALLAN CLAY,

        Defendant-Appellant.

UNPUBLISHED
February 26, 2019

No. 339916
Monroe Circuit Court
LC No. 16-243168-FC

Before: STEPHENS, P.J., and K. F. KELLY and TUKEL, JJ.

PER CURIAM.

Defendant appeals by right his jury conviction for first-degree criminal sexual conduct (CSC), MCL 750.520b.[1] He was sentenced as a habitual offender, second offense, MCL 769.10, to 40 to 75 years' imprisonment. We affirm in part and remand for review of sentence.

## I. BACKGROUND

This case arose from the defendant's sexual assault of Autumn Miller on the evening of June 9, 2016 at her friends' apartment. Earlier that day, Miller had called her friend Wesley and asked him to bring over a lighter in exchange for a shot of vodka and a cigarette because she did not have one. Sometime after 5:00 p.m., Wesley arrived with his friend Klare and the defendant. Miller recognized the defendant from Facebook because he had dated a friend of hers, but she did not know him personally. The four of them consumed one fifth of vodka and began drinking from a second bottle. It was after the second bottle was opened that defendant told Miller that he had some Neurontin pills and she traded him another shot for a pill. Defendant offered her another Neurontin pill, but before taking it, Miller told the defendant that she was not going to have sex with him as a form of payment for the pill. Defendant told her that she could just have

---

[1]Defendant was found not guilty on the additional charge of first-degree home invasion.

the pill, so she took it but felt no differently afterward.  After about an hour and a half, Miller told everyone they had to leave because they were being too loud.  It was after everyone left that Miller noticed her cigarettes and the other bottle of vodka were gone.  She texted Wesley and told him to return the items and he responded that he had not taken them.

Sometime later, Miller was sitting on the couch on Facebook when defendant unexpectedly walked through the front door.  She asked him if he had her liquor and cigarettes.  Defendant did not respond.  Instead he walked up to the couch and struck Miller on the left side of her head throwing her to the ground by her hair.  As he held her down, he vaginally penetrated her and bit her breasts.  Defendant then dragged her to the bathroom by her hair and threw her into the shower, hitting her head on the spigot.  After turning on the shower, defendant ejaculated on Miller in the tub and left.  Miller waited three minutes before turning off the water and getting out of the tub.  She retrieved her phone from the couch and called 9-1-1.  The police arrived and she was transported to the hospital by ambulance.  Detective John Schiappacasse was assigned to investigate Miller's CSC complaint.  On June 11, 2016, he met with Miller at the apartment and she identified the defendant as the person who assaulted her.  Defendant was subsequently interviewed by the police where he gave multiple versions of the assault.  These versions went from denial of sexual contact to asserting a consensual sexual act.  Defendant was then arrested and charged with first degree-CSC on August 8, 2016.

Numerous witnesses testified at trial.  Wesley and Klare testified that defendant had left the apartment with them and returned to Wesley's house.  Klare also testified that at some point, she remembered defendant no longer being at the house with them.  A neighbor staying in apartment 206 testified that she heard a female voice yell "help, stop, no" about 20 times for a period of about 20 to 30 minutes coming from apartment 204.  Miller was in apartment 204.  The apartments were separated by a hallway and stairwell.  All the windows to the apartment were open.

Officer Joshua Roelant testified that he responded to the 9-1-1 call just after 8:00 p.m. and Miller let him into the apartment.  He smelled the strong odor of intoxicants and observed that Miller's eyes were bloodshot and watery and that her speech was slurred.  Officer Roelant stated that during Miller's account of the assault, she "became very hysterical and began pacing back and forth."  She than asked Officer Roelant "to shoot her and kill her because she didn't believe this happened."  He testified that he followed her to the kitchen and restrained her from reaching for the kitchen knives by handcuffing her for her own safety and called an ambulance.

Angela Jordan, the sexual assault nurse examiner (SANE) who examined Miller at the hospital, testified that Miller was "combative" and screamed that she did not want to be there and "[he] raped me!"  Jordan testified that she explained the SANE forensic examination process to Miller, but that Miller was not able to consent to the exam "due to her mental status."  Because Miller could not consent, Lieutenant Terese Herrick, a patrol officer with the Monroe County Police Department, collected the necessary swabs and took photographs at Jordan's direction of bruises and cuts on Miller's body.  Herrick testified that she also photographed what appeared to be bite marks on Miller's chest.

Miller testified that she had no idea that defendant was coming back to the apartment.  She testified that she had screamed "no, stop, it hurts" during the assault.  Afterwards she stated

she called 9-1-1 and told the dispatcher that "Daniel raped me." She told the dispatcher it had happened in the shower. She also testified that she was hysterical and could not remember everything she said to the responding officer once he arrived. She recalled asking the officer to shoot her and being in handcuffs in the back of an ambulance. She could not remember if a sexual assault kit was performed at the hospital but testified that she had a big bruise on her chest and everything hurt upon being discharged from the hospital.

After the denial of his motion for directed verdict, defendant testified on his own behalf. He testified that he left the apartment with Wesley and Klare but walked back alone about an hour and a half later and Miller invited him in. According to defendant, Miller agreed to him coming back to the apartment and they engaged in consensual sexual intercourse on the floor on top of some blankets and clothes. He testified that when Miller said, "stop, stop, no," and "started freaking out on him," he "hopped up" and asked her what was wrong. Prior to Miller saying stop, he testified that she was making sounds that indicated she was enjoying herself so he believed the sex to be consensual. He also admitted that he had lied to the police during his questioning but stated he told the truth toward the end. After being deadlocked twice, the jury returned the guilty verdict from which defendant now appeals.

## II. SUFFICIENCY OF THE EVIDENCE

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *Id*. at 196.

Defendant argues that the sexual intercourse with Miller was consensual and further, that there was insufficient evidence to prove that he caused personal injury and used force or coercion to accomplish penetration. We disagree.

Defendant was charged and convicted of first-degree CSC. MCL 750.520b.

A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:

* * *

(c) Sexual penetration occurs under circumstances involving the commission of any other felony.

* * *

(f) The actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration . . . [MCL 750.520b(1)(c) and (f)].

There was sufficient evidence to support that defendant and Miller did not engage in consensual intercourse. Contrary to defendant's argument that Miller was flirting with him when they first

met, she testified that she had no sexual interest in defendant. Her testimony was further corroborated by the testimonies of Klare and Wesley. Both testified that neither of them witnessed Miller exhibit any flirtatious behavior or make any sexual advances toward defendant during the time all four of them were at the apartment. Klare also testified that Miller told her that she thought defendant was disgusting. Furthermore, Miller testified that she told defendant "no" and "stop" during the assault and a next door neighbor testified to hearing a woman yelling no, stop, and help around the same time the assault was taking place.

Secondly, there was also sufficient evidence to support that defendant caused personal injury to Miller. " 'Personal injury' means bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease, or loss or impairment of a sexual or reproductive organ." MCL 750.520a(n). Sufficient evidence of any one of these listed definitions will prove the element of personal injury. *People v Asevedo*, 217 Mich App 393, 397; 551 NW2d 478 (1996). Miller testified that during the assault, she yelled "ow" and "no, stop, it hurts." The SANE nurse testified that Miller had bruises and cuts on her body and Lieutenant Herrick testified to observing bite marks on Miller's breast and a bruise by her eye. Despite defendant's argument to the contrary, the bite marks did not need to be substantial nor did they have to occur contemporaneously with defendant's penetration. To constitute bodily injury, the physical injuries suffered "need not be permanent or substantial." *People v Mackle*, 241 Mich App 583, 596; 617 NW2d 339 (2000). Additionally, an act of penetration need not be considered in isolation and the Court is allowed to consider the bodily injury in connection with the assault. *Id* at 600.

Lastly, there was also sufficient evidence to establish that defendant's vaginal penetration of Miller was accomplished by force or coercion. The statutory definition of force or coercion includes "[w]hen the actor overcomes the victim through the actual application of physical force or physical violence." MCL 750.520b(1)(f)(*i*). Miller testified that when defendant first entered the apartment he hit her on the left side of her head and then knocked her to the ground. He then held Miller's arms above her head, placed a forearm across her neck and sexually assaulted her atop a pile of clothes. Afterwards, he dragged her by her hair to the bathroom and threw her into the shower where she hit her head on the spigot.

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to convince a jury beyond a reasonable doubt that the defendant committed first-degree CSC.

### III. MOTION TO CHANGE VENUE

Defendant argued in the trial court that a change of venue was warranted but argues for the first time on appeal that trial counsel was ineffective for failing to renew the motion to change venue at the time of jury selection. Thus this issue is only partially preserved. This Court reviews for an abuse of discretion whether the trial court erred by denying a defendant's motion for change of venue. *People v Lee*, 212 Mich App 228, 252; 537 NW2d 233 (1995), lv den 453 Mich 884 (1996). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Otherwise, we review an unpreserved change of venue issue for plain error affecting defendant's substantial rights. *People v Kowalski*, 489 Mich 488,

505; 803 NW2d 200 (2011). Our review of defendant's ineffective assistance of counsel claim is limited to mistakes apparent on the record, because no *Ginther*[2] hearing was held. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

Defendant first argues that the trial court erred in denying his motion to change venue where numerous articles and media coverage of his conviction for murder in a prior case during the trial for this offense created a presumption of prejudice. He also argues that trial counsel was ineffective for failing to renew the motion to change venue at the time of jury selection. We disagree.

"Generally, criminal defendants must be tried in the county where the crime was committed." *People v Unger*, 278 Mich App 210, 253-254; 749 NW2d 272 (2008). However, a change of venue might be warranted in cases of "extensive egregious media reporting," "a barrage of inflammatory publicity leading to a 'pattern of deep and bitter prejudice' against the defendant," "highly inflammatory attention to sensational details" or when "a carnival-like atmosphere surrounding the proceedings" develops. *People v Jendrzejewski*, 455 Mich 495, 506-508; 566 NW2d 530 (1997).

Defense counsel made a pre-trial motion for a change of venue. The court denied the motion without prejudice but defense counsel successfully requested the opportunity to renew the motion at the time of jury selection but did not do so and expressed satisfaction with the jury after voir dire. He now argues that he was deprived of his right to an impartial jury by the trial court's denial of his motion to change venue and faults the court for not questioning jurors individually to expose any bias during jury selection. However, defendant waived both these issues when he failed to renew his motion to change venue and expressed satisfaction with the jury. *People v Clark*, 243 Mich App 424, 425-426; 622 NW2d 344 (2000).

Defense counsel was also not ineffective for failing to renew the motion to change venue. To establish an ineffective assistance claim, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness under professional norms and (2) there is a reasonable probability that, but for counsel's errors, the result would have been different and the result that did occur was fundamentally unfair or unreliable." *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009).

Renewing the motion would have been meritless where none of the factors expressed in *Jendrzejewski* were present for defendant's jury pool. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *Ericksen*, 288 Mich App at 201. In accordance with *Jendrzejewski*, community bias is implied when "a high percentage of the venire . . . admit to a disqualifying prejudice." 455 Mich at 500-501. That did not occur here. During voir dire, defense counsel asked the venire how many of them were familiar with the defendant and defense counsel counted five on the record. Those who raised their hands were asked whether what they had heard or seen would prevent them from being a fair juror on this case. Those jurors who indicated they could not be fair were challenged and

---

[2] *People v Ginther*, 390 Mich 436, 440; 212 NW2d 922 (1973).

removed. Thus, counsel's decision not to renew defendant's motion to change venue was reasonable trial strategy. "If jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court, a change of venue is not necessary." *People v Prast*, 114 Mich App 469, 477; 319 NW2d 627 (1982) (internal citation omitted). Accordingly, defendant has not carried his burden of demonstrating that he was denied effective assistance of counsel.

## IV. RESENTENICING

Defendant argues for re-sentencing on two bases; erroneous scoring of OV8 and that the trial court abused its discretion when it imposed an upward departure sentence because the sentence was disproportionate and unreasonable. We reject the former but remand for re-sentencing for reasons stated below.

"The standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion." *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Mahone*, 294 Mich App at 212.

Defendant's challenge to the scoring of OV8[3] is without merit. OV8 is scored at 15 points when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense [.]" MCL 777.38(1)(a). Defendant argues that the bathroom did not constitute a place of "greater danger" upon which a score of 15 points was warranted. However, moving Miller to the bathroom from the living room did place her in greater danger because the bathroom was further from the exit to the apartment, contained only one way out, had no windows, and made it harder for someone to hear her cries for help. A place of greater danger includes an isolated location where crimes may avoid detection. *People v Dillard*, 303 Mich App 372, 379; 845 NW2d 518 (2013), abrogated on other grounds by *People v Barrera*, 500 Mich 14, 17; 892 NW2d 789 (2017). Defendant's choice to move Miller to the bathroom further isolated her and reduced detection of the assault. Accordingly, the scoring of 15 points for OV 8 was correct.

An upward departure sentence is unreasonable when it violates the principle of proportionality. *Steanhouse*, 500 Mich at 459-460. The "principle of proportionality," as set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), "requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." A trial court need only "provide adequate reasons for the extent of the departure sentence imposed ...." *Steanhouse*, 500 Mich at 476.

Defendant asserts that the court articulated no adequate reason for departure from the advisory guidelines range of 225-268 months and sentencing defendant to 480-900 months.

---

[3] "Offense variable 8 is victim asportation or captivity." MCL 777.38(1).

Contrary to defendant's contention on appeal, the court did make a record on this issue. The court offered several bases for its departure. Those reasons included the brutality of the assault and its effect on the victim. While the offense variables accounted for the asportation, physical injury and psychological injury to the victim, the court was aware that when the police arrived the victim asked them "to shoot her." The court did not abuse its discretion in finding that the guidelines did not give sufficient weight to the nature of the facts of this crime. The court, also found that the defendant had prior uncharged offenses from which the court made a finding that defendant was a serial rapist[4]. The appellant did not challenge the basis of that finding. The court further noted defendant's "substantial history of violating every term of community supervision he's ever received, even directed probation." Again, while the prior record variables took into account the defendant's prior convictions, the court did not abuse its discretion in finding that the length and scope of that prior record was given inadequate weight.

However, the last bases for departure, lack of remorse and consistent lying during interviews with law enforcement are concerning. In *People v Wesley*, 428 Mich 708, 711; 411 NW2d 159 (1987), our Court held that a defendant cannot be punished for failing to admit guilt. "We would hold that while a sentencing court cannot, in whole or in part, base its sentence on a defendant's refusal to admit guilt, *People v Yennior*, 399 Mich 892; 282 NW2d 920 (1977), evidence of a lack of remorse can be considered in determining an individual's potential for rehabilitation." *Wesley*, 428 Mich at 711. Here the trial court made it clear when stating its reasons for exceeding the sentencing guidelines that defendant's assertion of innocence was not the reason for imposing the harsh sentence. In this case the trial court did not state that the lack of remorse was indicative of the defendant's rehabilitative potential but in light of the contemporaneous discussion of the defendant's failure to benefit from community supervision and his long pattern of errant behavior, it is reasonable to infer that this factor related to rehabilitative potential. However, the issue of lying to officers during interviews is another matter. Ten points were scored against defendant under OV 19. Obstruction of the administration of justice is scored under the offense variables and has a broad scope under Michigan law. To use lying to law enforcement during interviews as a basis for an upward departure appears to penalize a defendant for failing to admit guilt. As noted in *Dixon-Bey*[5], where the trial court offered no explanation as to why the OV19 scoring gave inadequate weight to this conduct a remand is appropriate. On remand the court has the opportunity to articulate its reasons for utilizing this factor in the departure so that this Court has a full record upon which to determine reasonableness and proportionality of the sentence.

---

[4] The prosecution filed a sentencing memorandum in this matter which noted that during a prior prosecution where the defendant was convicted of felony murder (December 2018 Case Call Item #3, People v Clay, Docket No. 339659), two young women came forward stating that defendant had raped them too. According to these women, the rapes occurred while they were 13 years old and defendant was 16 years old in one instance, and 17 years old in the other.

[5] *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017).

Affirmed in part and remanded for review of sentence.  We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Kirsten Frank Kelly
/s/ Jonathan Tukel