*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

THOMAS JAMES GUTHRIE,

        Defendant-Appellant.

UNPUBLISHED
March 28, 2019

No. 341269
Alpena Circuit Court
LC No. 16-007336-FC

Before: CAMERON, P.J., and BECKERING and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant, Thomas James Guthrie, appeals as of right his convictions of, and sentences for, two counts of first-degree criminal sexual conduct, one under MCL 750.520b(1)(c) (sexual penetration involving another felony), and one under MCL 750.520b(1)(f) (sexual penetration accomplished by force or coercion and causing personal injury). The trial court sentenced defendant, as a fourth-offense habitual offender, MCL 769.12, to 20 to 50 years in prison for each conviction, to be served concurrently. The court also assessed costs of $866. We affirm the CSC conviction predicated on force or coercion resulting in personal injury and the imposition of court costs, but vacate the CSC conviction predicated on sexual penetration involving another felony (i.e., unlawful imprisonment) and also remand this case for resentencing on the remaining CSC conviction.

## I. FACTS

Defendant's convictions arise from allegations that he sexually assaulted a male acquaintance on the night of August 10, 2005. A police sergeant testified at trial that he became involved in investigating this case after speaking with defendant in March 2016, as part of an unrelated investigation in which defendant seemed to be a potential witness. Asked how the instant matter came up, the officer replied:

> I was speaking with [defendant] and he was telling me about his ex-wife. And about terrible lies that his ex-wife used to tell about him. And he stated that his ex-wife used to spread rumors about him raping [the complainant]. And that

-1-

he was never charged with anything but . . . she used to spread lies about the incident to people.

The officer added that his follow-up revealed that there had been an "initial investigation." The officer spoke of a "report . . . from like the 2005 era," and stated that he "sent it up to [the prosecuting attorney's] office just for his information."

The complaining witness testified that he, defendant, and others had been drinking and were the last two members of the group who were still awake when defendant became aggressive, forcing the complainant back into his chair repeatedly, grabbing his throat so that he could not call out to a sleeping friend for help, and threatening to knock him unconscious, with the taunt that the complainant need not be conscious for defendant to do what he intended to do. According to the complainant, defendant first performed fellatio on him, then forced him into an upstairs bedroom, where defendant penetrated him anally, then forced the complainant to first penetrate defendant anally and then to perform fellatio on defendant. The complainant testified that he reported defendant's assault to the police about three months after the incident, and that he felt "angry" when no prosecution followed at that time. He also testified that he had sought a personal protection order, but "[i]t was denied."

Steve Frank testified that he came to know the complainant in 2000, and recounted visiting a bar in 2005 with the complainant and there meeting Rick Stach and defendant. According to Frank, the four of them ended up at Stach's house after the bar closed, but Frank made a point of getting home that night. Approximately two days later, Frank saw the complainant at work for their evening shift. He noticed that the complainant was acting odd and was awfully quiet, which was uncharacteristic because he was normally talkative. The complainant was quiet on every break and seemed bothered by something. Frank asked him why he was being so quiet and if something was wrong. The complainant said yes and started to talk about the night with defendant. When Frank began to testify about what the complainant told him next, defendant's attorney interjected. He objected to the witness testifying to anything "with specificity," which the prosecutor said was fine. The prosecutor then asked Frank if defendant revealed something to Frank, and asked Frank to describe "in general terms" what the complainant told him. Frank stated that it was in regard to defendant, and the complainant told him that defendant had forced him to have sex, and then the complainant started crying. The prosecutor focused his ensuing questions on the complainant's behavior, and Frank described that the complainant started "just bawling, crying, trying to explain to me what happened." When Frank started to get into more specific details about what the complainant had said, the prosecutor stopped him and inquired about the number of times Frank and the complainant had talked about the incident and how the complainant acted whenever the conversation came up. Frank also testified about a conversation he had on Facebook messenger with a person who went by the name of "Tommy," and Frank told the person that he knew what he had done to the complainant.

Rick Stach testified about his recollections of the night of the alleged incident and having a discussion about what had happened according to the complainant. Like Frank, Stach was instructed to avoid detailing what the complainant said specifically, other than that he said he had been raped by defendant. The questions of Stach were focused on the complainant's emotions when describing the incident to Stach. When describing the incident, Stach testified that the

complainant "looked white. He was kind of teary. He was just more awkward than normal. It was just a very different feeling. I can't tell you his –we was very afraid, scared. I don't know. He was ashamed maybe. Embarrased."

Defendant testified at trial and admitted to the sexual activity between the complainant and himself, but contended that it was entirely consensual. According to defendant, about a week afterward, he and Natalie Linder, the recent ex-girlfriend of Stach, defendant's friend in whose house the sexual activity took place, encountered Stach and the complainant at a bar. Defendant claimed that Stach, despite having initially given his blessing to defendant's dating Linder, was now cool toward him out of jealousy, and the complainant expressed concerns that "somebody found out what we did and that's not cool." Defendant testified that, for a time, Stach spoke ill of defendant as part of his campaign to reclaim Linder for himself. Defendant stated that Stach "was running around town" broadcasting his version of what happened between defendant and the complainant, telling everyone defendant knew about "[t]his big bad rape case that absolutely did not happen."

Defendant testified that he remembered Steve Frank identifying himself in a social networking message and saying that he knew what defendant had done to the complainant. Defendant agreed that he responded, "Listen bro, [the complainant] went in my shorts after I won a bunch of money playing poker. I passed out. He tried ripping me off. My ex-wife put him up to that after I slapped the sh*t out of him." Defendant explained that he wrote that because "[i]t's better than saying, oh gee, me and [the complainant] had sex together. I mean come on."

As defendant was originally charged, counts 1 through 4 alleged criminal sexual conduct in connection with another victim who was under 13 years of age, but the case relating to that complainant was severed from the instant one. Counts 5 and 6 of the original complaint related to complainant. Count 5 alleged first-degree CSC on the basis that sexual penetration took place during the commission of another felony, MCL 750.520b(1)(c), and Count 6 alleged first-degree CSC on the basis that defendant accomplished sexual penetration by force or threats, and thereby caused personal injury, MCL 750.520b(1)(f). The jury found defendant guilty of both counts.

II. COMMON-LAW UNLAWFUL IMPRISONMENT

Defendant first argues that the trial court erred by recognizing common-law unlawful imprisonment for purposes of the charge of first-degree CSC based on the commission of another felony, MCL 750.520b(1)(c). We agree.

The eligibility of a common-law crime to serve as the aggravating factor for a conviction of first-degree CSC under MCL 750.520b(1)(c) is a question of law. This Court reviews questions of law de novo, *People v Melotik*, 221 Mich App 190, 198; 561 NW2d 453 (1997), which includes statutory interpretation, see *People v Denio*, 454 Mich 691, 698; 564 NW2d 13 (1997).

The Michigan Legislature added this state's unlawful imprisonment statute, MCL 750.349b, to the criminal code by 2006 PA 160, effective August 24, 2006, which was after the conduct here at issue took place. For that reason, defense counsel requested a directed verdict on the CSC charge under MCL 750.520b(1)(c). The trial court denied the motion, stating

incorrectly that "unlawful imprisonment was a felony at common law," and concluding therefrom that "even at common law it is sufficient to . . . support the factual finding in the CSC during a felony."

On appeal, plaintiff concedes that because the Legislature enacted MCL 750.349b after the events underlying this case, the statute may not serve as the predicate felony for the CSC charge involving another felony. At issue, then, is whether the trial court properly relied on the common-law version of unlawful imprisonment for this purpose.

The Michigan Penal Code recognizes the continuing validity of prosecutions of common-law crimes:

> Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by a fine of not more than $10,000.00, or both in the discretion of the court. [MCL 750.505.]

That common-law felonies may serve as predicates for statutory offenses needing predicate felonies is not itself in dispute. See, e.g., *People v Terry*, 86 Mich App 64, 66-67; 272 NW2d 198 (1978) (approving the use of common-law rape for prosecutions of felony-murder). In this case, however, the trial court was hasty in declaring common-law unlawful imprisonment a "felony." Our Supreme Court has recognized "the common-law *misdemeanor* offense of false imprisonment," following that characterization by quoting with approval a legal text describing " '[f]alse imprisonment, sometimes called false arrest' " as " 'a common-law misdemeanor.' " *People v Wesley*, 421 Mich 375, 384; 365 NW2d 692, 695 (1984) (italics added), quoting Perkins, Criminal Law (2d ed), p 171. Also instructive is that the Model Penal Code sets forth the crime of "false imprisonment" as follows: "A person commits a *misdemeanor* if he knowingly restrains another unlawfully so as to interfere substantially with his liberty." Model Penal Code § 212.3 (italics added).

The prosecution concedes that unlawful imprisonment, or false imprisonment, was a misdemeanor at common law, but argues that the trial court nonetheless correctly treated it as a felony for present purposes on the ground that MCL 750.505 declares any offense indictable at common law a "felony." We do not agree that the pertinent statute operates that way.

The purpose of statutory interpretation is to give effect to the intent of the Legislature. *Denio*, 454 Mich at 699. MCL 750.505 appears in a group of statutes setting maximum punishments for offenses for which Michigan's statutory scheme has not provided punishments. Section 503 sets forth the maximum punishment of "a person convicted of a felony for which no punishment is specially prescribed," and § 504 does the same for persons convicted of statutory misdemeanors. Similarly, § 505 provides that persons who commit offenses indictable at common law "for which no provision is expressly made by any statute of this state" are guilty of a felony and may be incarcerated in the state prison for a maximum of five years and subject to a fine of not more than $10,000. Because it provides for punishment of crimes that might otherwise go unpunished, Courts have referred to § 505 as a "catchall" provision. *People v Waterstone*, 296 Mich App 121, 143 n 6; 818 NW2d 432 (2012) (identifying MCL 750.505 as a "broad common-law catchall provision"); *People v Cunningham*, 201 Mich App 720, 722; 506

NW2d 624 (1993) ("The crime of accessory after the fact is a common-law felony punishable under the catch-all provision of MCL 750.505."). We note that the prosecution has not cited any binding authority, nor have we found any, establishing that a common-law misdemeanor falling under MCL 750.505 may function as a predicate felony. To accept the prosecution's proposed interpretation or extrapolation from MCL 750.505 would mean that common-law misdemeanors punished under MCL 750.505 would operate as predicate felonies, whereas statutory misdemeanors would not. Thus, we limit the applicability of MCL 750.505 to its intended purpose of giving leeway to a sentencing court in fashioning a sentence where one is not provided at common law, and we conclude that MCL 750.505 refers to "any indictable offense at the common law" as a "felony" for the convenience of generally authorizing up to a five-year maximum sentence, not for the purpose of upgrading all common-law misdemeanors to statutory felonies.[1]

We further conclude that the Legislature specified "any other felony" in MCL 750.520b(1)(c) in order to target serious criminal activity, and thus did not intend for that specification to eliminate from consideration only statutory misdemeanors while embracing all conceivable common-law misdemeanors charged under MCL 750.505. See *People v Tennyson*, 487 Mich 730, 741 n 6; 790 NW2d 354 (2010); see also *McAuley v Gen Motors Corp*, 457 Mich 513, 518; 578 NW2d 282 (1998) ("Statutes should be construed so as to prevent absurd results, injustice, or prejudice to the public interest.").[2]

For these reasons, we vacate defendant's conviction of, and sentence for, first-degree CSC predicated on sexual penetration involving another felony, MCL 750.520b(1)(c).

Even if we were to conclude that common-law false imprisonment could serve as a predicate felony for purposes of MCL 750.520b(1)(c), we nevertheless would remand this case to the trial court to vacate one of defendant's convictions and sentences and to amend the judgment of sentence to reflect a single conviction and sentence supported by two theories. The

---

[1] The prosecution argues that viewing common-law false imprisonment as a felony makes sense because the Legislature made unlawful imprisonment a 15-year felony when it codified it in 2006. See 2006 PA 160; MCL 750.349b. However, statutory unlawful imprisonment added conditions not present in common-law false imprisonment. " 'False imprisonment . . . is the unlawful confinement of a person. It results from any unlawful exercise or show of force by which a person is compelled to remain where he does not wish to remain or go where he does not wish to go.' " *People v Wesley*, 421 Mich 375, 384; 365 NW2d 692 (1984), quoting Perkins, Criminal Law (2d ed), p 171. Statutory unlawful imprisonment must include the use of a weapon or dangerous instrument, or secret confinement, or must be committed to facilitate flight after commission of another felony. MCL 750.349b(1). The misdemeanor of common-law false imprisonment required none of these circumstances.

[2] We acknowledge that our Supreme Court has not clearly set forth a standard for applying the rule of absurd results. See *Johnson v Recca*, 492 Mich 169, 192-193; 821 NW2d 520 (2012) (recognizing that the Michigan Supreme Court justices differ on the rule and opining that it applies only when it is quite impossible that the Legislature could have intended the result).

complaining witness described four sexual penetrations: defendant's oral and anal penetration of him, and his forced oral and anal penetration of defendant. The felony complaint alleged two counts of CSC I, both based on "penis/mouth and/or penis/anus penetration "with [the complainant]." One could interpret "with [the complainant]" to account for all four penetrations: two penetrations of the complainant by defendant and two penetrations of defendant by the complainant. However, this is not how the case was prosecuted or how the trial court instructed the jury.

After closing arguments, the trial court instructed the jury as follows:

Now we've been talking about elements of the *two crimes* that are charged here. And I'll be sending these in with you, okay, so you'll know what the elements are.

In the case of, what we've identified as *count one*, further, criminal sexual conduct in the first degree during a felony. The defendant is charged with the crime of first-degree criminal sexual conduct.

To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt. First that the *defendant engaged in a sexual act that involved entry into . . . [the complainant's] anal opening by the defendant's penis. . . . Or entry into [the complainant's] mouth by the defendant's penis.*

Second that the alleged sexual act occurred under circumstances that also involve *common law, unlawful imprisonment. . . .*

* * *

We've identified the second charge as *count two*. The defendant is charged with the crime of first-degree criminal sexual conduct. To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt.

First *entry into [the complainant's] mouth and or anal opening by defendant's penis.* Any entry, no matter how slight, is enough. It does not matter whether the sexual act was completed or whether semen was ejaculated.

Second, that the defendant *caused personal injury to [the complainant].* [Emphasis added].

Although the prosecutor and the trial court represented the charges against defendant as two separate counts, both counts were predicated on the same behavior, defendant's penal penetration of the complaining witness's anus and/or mouth, and differ only by the circumstances under which they occurred, i.e., false imprisonment and force. The prosecution did not charge defendant with forcing the complaining witness to perform fellatio on him or to penetrate him anally, nor was the jury asked to find that defendant forced the complaining witness to perform sex acts on him. Thus, regardless of the prosecution's and the trial court's characterization of the charges against defendant as two separate charges, the prosecutor here chose to prosecute defendant for all of his alleged sexual misconduct considered in the

aggregate, as a single incident, with charges for the same incident using two separate charging theories.

That the prosecutor charged defendant with one continuous act of criminal sexual conduct involving either oral or anal penetration of the complaining witness, or both, is made clear by the prosecution's observation at the preliminary examination that the two charges against defendant are "in the alternative." Also supporting the analysis is the prosecution's statements at sentencing explaining its recommendation to score OV 11 (criminal sexual penetration) at 50 points for two or more criminal sexual penetrations. Defense counsel objected that the prosecution could not charge for fewer penetrations than it thought happened, and then use the other alleged penetrations to elevate the sentencing guidelines. The prosecution disagreed, responding:

> You charge for the *continuous act of criminal sexual conduct* without itemizing each individual penetration that occurred and charging those as separate and distinct acts. You charge it as one. It's, it's just like when you do a home invasion and it's the continuous act that's a crime.
>
> And he's asking us to have to bifurcate every single one and say nope, that's a crime. No that's a crime. No that's a crime. That's not what we're required to do. And under this scenario you'd never score OV-11 because you'd always have to do it in a different way. You'd always have to charge each individual penetration separately.
>
> * * *
>
> We charged him with two separate charges. They did not itemize separate and distinct penetrations within the criminal conduct. They were different because they had different elements. One was for unlawful imprisonment. One was causing, for causing injury. [Emphasis added.]

The prosecution here acknowledges that it charged the defendant with one "continuous act of criminal sexual conduct" (involving defendant's penal penetration of the complainant's mouth, anus, or both) under two theories of aggravation. The prosecution did not distinguish between defendant's separate penetrations of the complaining witness, and it used the alleged penetrations of defendant by the complaining witness to elevate defendant's OV score by 50 points.

Where one act of criminal sexual conduct is committed under two separate theories, as the prosecution alleged happened here, if both theories are vindicated, to avoid a violation of double jeopardy principles, the result would properly be a single conviction and sentence supported by two theories. See *People v Mackle*, 241 Mich App 583, 601; 617 NW2d 339 (2000). For this reason, even if we had concluded that common-law false imprisonment could serve as a predicate felony for purposes of MCL 750.520b(1)(c), we would remand the case to the trial court to amend the judgment of sentence to avoid a double jeopardy violation.

III. OFFENSE VARIABLES

Defendant challenges the trial court's assessment of 50 points each for Offense Variables (OVs) 7 and 11 of the sentencing guidelines. We review the circuit court's factual determinations, which "must be supported by a preponderance of the evidence," for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute . . . is a question of statutory interpretation, which [this Court] reviews de novo." *Id*.

A criminal defendant has a due process right to be sentenced based on accurate information. See *People v Hoyt*, 185 Mich App 531, 533; 462 NW2d 793 (1990), citing US Const, Am XIV, § 1, and Const 1963, art 1, § 17. See also MCL 769.34(10) (authorizing remand for resentencing upon discovery that the sentencing court relied on inaccurate information in fashioning sentence). Accordingly, "[a] sentence is invalid when a sentencing court relies on an inappropriate guidelines range." *People v McGraw*, 484 Mich 120, 131; 771 NW2d 655 (2009).

A. OV 7

OV 7 addresses aggravated physical abuse. MCL 777.37(1). The trial court originally scored zero points for this variable. At sentencing, however, the prosecutor persuaded the trial court to assess 50 points, as prescribed by MCL 777.37(1)(a) at the time relevant where the offender treated the victim "with sadism, torture, or excessive brutality *or* conduct designed to substantially increase the fear and anxiety a victim suffered during the offense" (emphasis added).[3] In rebuffing defendant's protestations, the trial court explained:

> He was not allowed to leave. He was choked, according to him. The, there was some sexual contact on the first floor of the residence. Some sexual contact on the second floor of the residence. . . . I think there is evidence of excessive brutality designed to increase the fear and anxiety of the victim. So I'm gonna honor his request to add fifty points to the, to OV-7.

When defense counsel argued that the conduct did not rise to the level of treating somebody with sadism, torture, or excessive brutality, the prosecutor offered that the conduct was designed to increase the fear and anxiety the complainant suffered during the offense. The court appeared to land on the concept that the conduct was designed to increase the complainant's fear, but then stated again that there was evidence of "excessive brutality designed to increase the fear and anxiety of the victim." Thus, it is not entirely clear from the trial court's remarks whether it

---

[3] The statutory scheme setting forth the sentencing guidelines includes the instruction to calculate "the appropriate sentence range under the version of those sentencing guidelines in effect on the date the crime was committed." MCL 769.34(2). The Legislature amended the statute underlying OV 7 by 2015 PA 137, effective January 5, 2016. Because this case concerns conduct that took place in 2005, it is the 2005 version of the statute that applies. The court's comments on the record during sentencing clearly indicate that it properly consulted the version of the statute in effect at the time defendant committed the charged crimes.

scored OV 7 based on excessive brutality, or conduct designed to substantially increase the fear and anxiety the complainant suffered during the offense, or both.

The complainant described the incident at trial. He testified that he and defendant were in the living room when defendant started flirting with him heavily. The complainant rebuffed defendant's flirtations and said he was not gay. The complainant was sitting in a recliner, and defendant came toward him while flirting. When the complainant started to rise up out of his chair, defendant pushed him down. The complainant noted that he was not sober at that point, having had a number of beers. The complainant tried to get up a second time, and defendant pushed him back down. The third time the complainant tried to get up out of the chair, defendant reached out with his hand and had the complainant by the throat and kept him down in the chair by leaning over him.[4] The complainant at that point knew defendant was not going to let him leave.[5] Defendant let go of the complainant's throat. The victim tried to yell for his friend, and defendant put a hand over his mouth and said not to make another move, not to make a commotion, or he would knock him out. Defendant had one of his hands cocked back. When the complainant asked what he meant by that, defendant said the complainant did not need to be conscious for him to do what he needed to do, or was going to do. The complainant testified that he then just did whatever defendant told him to do. During oral sex, defendant told the complainant to stop using his teeth or defendant would knock him out. At the end of everything, defendant laughed and said the complainant could go.

We conclude that a preponderance of the evidence does not support a finding of excessive brutality. The trial court clearly erred by declaring that defendant "choked" the complainant, given that the latter's trial testimony nowhere suggested that defendant applied that much force when grabbing him by the throat, and that at the preliminary examination the complainant described the action as not cutting the circulation off. The complainant's account of defendant's conduct might well be considered a description of "brutality," but not one of "excessive brutality." Defendant pushed the complainant down in a chair as the complainant attempted to rise, but did not do so in an injurious way. Defendant held his fist in the air, but did not strike the complainant. There was no indication that defendant offered any of his constraining or threatening conduct in furtherance of anything more aggressive than endeavoring to overcome his victim's resistance.

---

[4] At the preliminary examination, the prosecution asked the complainant more about defendant's hand on his throat, asking if he could breathe at that time. The complainant testified, "I—well, I didn't try. Well, I don't know if I tried. I wasn't worried about . . . breathing at that point. It wasn't –it was—it was aggressive, but it was not cutting the circulation off."

[5] On cross-examination defense counsel asked the complainant if defendant had threatened him in any way. The complainant testified that defendant mentioned the fact that he had been in prison and knew how to handle guys like the complainant. When defense counsel asked again whether defendant had threatened him, the complainant said before the throat incident, no.

The *Hardy* Court addressed what is required to establish that a defendant engaged in conduct "designed to substantially increase the fear and anxiety a victim suffered during the offense," reasoning as follows:

> The phrase begins with the words "conduct designed." "Designed" means "to intend for a definite purpose." Thus, the word "designed" requires courts to evaluate the intent motivating the defendant's conduct. Next, we come to the words "substantially increase." "Substantial" means "of ample or considerable amount, quantity, size, etc." To "increase" means "to make greater, as in number, size, strength, or quality; augment." Applying these definitions to the relevant text, we conclude that it is proper to assess points under OV 7 for conduct that was intended to make a victim's fear or anxiety greater by a considerable amount. [*Hardy*, 494 Mich at 440-441.]

"All . . . crimes against a person involve the infliction of a certain amount of fear and anxiety." *Id*. at 442 (quotation marks and citation omitted). To assess points for OV 7 under the "conduct designed" category, a court "must first determine a baseline for the amount of fear and anxiety experienced by a victim of the type of crime or crimes at issue." *Id*. at 442-443. To make this determination, the Court explained,

> a court should consider the severity of the crime, the elements of the offense, and the different ways in which those elements can be satisfied. Then the court should determine, to the extent practicable, the fear or anxiety associated with the minimum conduct necessary to commit the offense. Finally, the court should closely examine the pertinent record evidence, including how the crime was actually committed by the defendant. [*Id*. at 443.]

Thus, "[t]he relevant inquiries are (1) whether the defendant engaged in conduct beyond the minimum required to commit the offense; and, if so, (2) whether the conduct was intended to make a victim's fear or anxiety greater by a considerable amount." *Id*. at 443-444.

The trial court's observation that some sexual contact took place on both the first and second floor of the house had no bearing on the question of excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense, and thus was gratuitous. A preponderance of the evidence supports a finding that defendant threatened the complainant in such a way as to cause him to yield to defendant's sexual advances, but it does not support a finding that defendant's remarks were intended to make the complainant's fear or anxiety greater by a considerable amount, or that he engaged in conduct beyond the minimum required to commit the offense. Under the circumstances presented, and for the reasons stated above, we conclude that the trial court erred by agreeing with the prosecution's argument at sentencing and scoring OV 7 at 50 points.

## B. OV 11

OV 11 concerns sexual penetrations. MCL 777.41(1)(a) prescribes 50 points where "[t]wo or more criminal sexual penetrations occurred." The accompanying instructions state, "Score all sexual penetrations of the victim by the offender arising out of the sentencing offense." MCL 777.41(2)(a). The instructions further state that the court shall "not score points

-10-

for the 1 penetration that forms the basis of a first- or third-degree criminal sexual conduct offense." MCL 777.41(2)(c).

In evidence were four penetrations arising from the incident in question. After vacating the conviction predicated on commission of another felony, what is left is a single conviction of first-degree CSC stemming from an episode featuring four penetrations. Because regarding any one of them as the one not to count for purposes of MCL 777.41(2)(c) leaves three others for purposes of MCL 777.41(1)(a), the assessment of 50 points was proper.

On appeal, defendant proposes a narrow reading of the statutory specifications concerning what penetrations the court may count. The complainant described defendant as forcibly penetrating him once orally and once anally and as forcing the complainant to penetrate defendant once orally and once annually. Appellate counsel contends that only the two penetrations of the complainant by defendant factor into OV 11 because the statute specifies "penetrations of the victim by the offender," thus excluding from consideration penetrations by the complainant of defendant. This reasoning leaves only a single penetration eligible for scoring OV 11.

We do not agree that the scoring of OV 11 requires distinguishing between the penetrator and the person penetrated, i.e., who penetrated whom. "Sexual penetration," for purposes of CSC, is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body," with no distinction whether the offender penetrates the victim or causes the victim to penetrate the offender. MCL 750.520a(r). We decline to read the instruction to "[s]core all sexual penetrations of the victim by the offender arising out of the sentencing offense," MCL 777.41(2)(a), as differentiating the penetrator from the person penetrated in a way that the pertinent definition of "sexual penetration" does not. Instead, we read that instruction as covering all criminal penetrations that the offender caused the victim to suffer.

Because the record supports a finding of two acts of criminal sexual penetration in addition to the "one continuous act of criminal sexual conduct" that is the basis of defendant's conviction, we conclude that the trial court did not err by assessing 50 points for OV 11.

IV. SPECIFIC UNANIMITY INSTRUCTION

Defendant argues that the trial court erred by failing to instruct the jury that it must unanimously agree on which of four separate acts of criminal sexual penetration described in the testimony was proved beyond a reasonable doubt. We disagree. This issue is unpreserved because defendant did not request a specific unanimity instruction below; accordingly, our review is for plain error affecting substantial rights. *People v Knapp*, 244 Mich App 361, 375; 624 NW2d 227 (2001). A plain error affects substantial rights if it "affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Reversal will be "warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant" or when the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.* at 763-764 (quotation marks and citation omitted).

For a jury trial to result in a criminal conviction, the jury's verdict must be unanimous. Const 1963, art 1, § 14; MCR 6.410(B). Our Supreme Court has observed that "[i]t is not always clear where to draw the line dividing more general, 'material' fact issues, on which the jury properly must be unanimous in order to convict, from more specific, 'immaterial' issues, on which jurors may disagree without foreclosing the possibility of an acceptable guilty verdict." *People v Cooks*, 446 Mich 503, 512 n 13; 521 NW2d 275 (1994), quoting with approval Comment, *Right to Jury Unanimity on Material Fact Issues:* United States v Gipson [553 F2d 453 (CA 5, 1977)], 91 Harv L Rev 499, 501-502 (1977). The *Cooks* Court further observed:

> [A] specific unanimity instruction is not required in *all* cases in which more than one act is presented as evidence of the actus reus of a single criminal offense. The critical inquiry is whether either party has presented evidence that *materially* distinguishes any of the alleged multiple acts from the others. In other words, where materially identical evidence is presented with respect to each act, and there is no juror confusion, a general unanimity instruction will suffice. [*Cooks*, 446 Mich at 512-513 (italics retained).]

In this case, as noted, the complainant described four distinct penetrations taking place one after another. "In interpreting the first-degree criminal sexual conduct statute, Michigan courts have consistently held that the Legislature intended to punish separately each criminal sexual penetration." *People v Wilson*, 196 Mich App 604, 608; 493 NW2d 471 (1992). The prosecution might thus have endeavored to maintain separate charges covering each alleged penetration. It chose instead not to differentiate penetrations while proceeding on two theories of aggravation. Similarly, defense counsel might have attempted to tailor the inquiry, and jury instructions, to connect any one charge to a distinctly identified penetration. It elected not to do so. Both parties treated the complainant's account of four penetrations as a single episode of criminal conduct. Accordingly, the trial court instructed the jury on the elements of first-degree CSC, setting forth as two counts the alternative aggravating theories of penetration, but without otherwise factually distinguishing the two counts. The court specified that for both counts the prosecution had the burden to prove that defendant penetrated the complainant's mouth *or* anus. The court thus did not specifically instruct the jury that finding defendant guilty under either theory required that the jurors link the charge, and their attendant conclusions, to a single agreed-upon penetration. Defense counsel expressly declined to record any objections to the instructions as given when invited to do so.

Because the complainant described multiple penetrations taking place on a single occasion, but the prosecution elected to charge the whole incident as a single instance of first-degree CSC under alternative theories of aggravation, this is one of the situations where it is not obvious whether the general unanimity instruction would properly have been supplemented with a specific unanimity instruction. See *Cooks*, 446 Mich at 512 n 13. Furthermore, in *People v Van Dorsten*, 441 Mich 540, 545; 494 NW2d 737 (1993), our Supreme Court concluded that reversal was not required for want of a specific unanimity instruction where none had been requested, the "number or specific identification of acts of sexual penetration was not in dispute," and "[i]t was obvious to the participants in the trial that the verdict turned on whether the jury believed the testimony of the complainant" as opposed to the defendant's protestations that no sexual assault took place. In the instant case, there was no request for a specific unanimity instruction, the extent of the sexual activity at issue was not in dispute, and it was

obvious to all involved that the verdict turned on whether the jury believed the complainant's account of being threatened and forced, or defendant's account of consensual interactions.

For these reasons, we conclude that the trial court did not commit plain error by failing sua sponte to provide a specific unanimity instruction.

## V. USE OF DEFENDANT'S SILENCE

Defendant argues that the prosecutor, by way of certain commentary included with closing argument, improperly urged the jury to infer guilt based on defendant's post-arrest silence. Again, we disagree. Because defense counsel did not object below to the comments now challenged on appeal, our review is for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

Issues relating to prosecutorial use of a defendant's silence implicate the rights to due process and against self-incrimination. See US Const, Ams V & XIV; Const 1963, art 1, § 17. "[E]ven in the face of specific accusation of a crime . . . an accused's silence may not be used against him." *People v Bobo*, 390 Mich 355, 360-361; 212 NW2d 190 (1973). Accordingly, a prosecutor may not use a defendant's silence after receiving *Miranda*[6] warnings to impeach a defendant's exculpatory version of events told for the first time at trial. *Doyle v Ohio*, 426 US 610, 611, 619; 96 S Ct 2240; 49 L Ed 2d 91 (1976). However, where a defendant voluntarily makes a statement, questioning regarding omissions from that statement is proper impeachment. *People v Wigfall*, 160 Mich App 765, 779; 408 NW2d 551 (1987). This applies even in connection with a defendant who has been arrested and advised of his *Miranda* rights. *Id.* at 780, citing *Anderson v Charles*, 447 US 404; 100 S Ct 2180; 65 L Ed 2d 222 (1980). The inquiry is whether the defendant's silence was used strictly for impeachment, and not as direct evidence of the defendant's guilt. *People v Vanover*, 200 Mich App 498, 503; 505 NW2d 21 (1993).

A prosecutor enjoys wide latitude in fashioning arguments, and may argue the evidence and all reasonable inferences from it. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Prosecutorial misconduct issues are decided on a case-by-case basis, and the reviewing court must examine the record and evaluate a prosecutor's remarks in context. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). The propriety of a prosecutor's remarks depends on all the facts of the case. *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002).

Defendant bases his claim of error not on trial testimony or attempted impeachment, but on certain statements the prosecutor made during closing argument. Defendant does not suggest that the challenged commentary did not relate directly to matters in evidence, but that the prosecutor made improper use of certain testimony. Specifically, defendant argues that his assertion that his former wife falsely maintained that he had "raped" the complainant comported with defendant's theory of consent offered at trial and that the prosecution's mention in closing argument that defendant had not offered his defense of consent to the police in the 12 years before trial improperly suggested otherwise. Defendant further argues that the prosecutor

---

[6] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1963).

intended such suggestions to encourage the jury to draw an inference of his guilt from his post-arrest, post-*Miranda* silence.

After carefully reviewing the prosecutor's comments in context, *Mann*, 288 Mich App at 119, we find no error. The prosecutor did suggest that defendant had ample time before his trial to assert that the sexual activity was consensual. However, nothing in the prosecutor's closing remarks emphasized the period after defendant was formally charged in this case. Instead, the prosecutor's comments addressed the 12 years since the incident in question, during which defendant simply denied that sexual activity took place, and in one instance offered a detailed alternative explanation for a conflict situation between himself and the complainant. Comments relating to defendant actually talking to the police referred to what defendant volunteered to a police sergeant who was interviewing him well before he faced charges in this matter, and who was not interrogating defendant as a suspect. Further, attributing the existence of innuendoes of his having "raped" a male acquaintance entirely to false accusations, with no implication that consensual sexual relations were involved, was an example of offering the police an explanation while omitting key information relating to the defense offered at trial. See *Wigfall*, 160 Mich App at 779.

The prosecution's general remarks about defendant not offering a consent theory before trial referred to defendant telling Steve Frank in the social media exchange that the complainant was trying to steal money from defendant's "shorts" while defendant was sleeping, in response to which defendant "slapped the sh*t out of him." That exchange also took place before defendant was charged in this case and had nothing to do with police interrogation. Further, when defendant testified about it, he acknowledged that his story implied that no sexual activity took place at all. Defendant was not declining to respond to an allegation in that situation, but rather unhesitatingly putting forward an innocent explanation for why certain persons accused him of sexual aggression. If merely denying that he "raped" the complainant could be deemed to comport with an unmentioned consent explanation, defendant's talk of responding violently to an attempted theft from his person could hardly be reconciled with an incident of consensual sex taking place on the same occasion.

The prosecutor's talk of how defendant could have "come forward" at any time with his theory of consent was not an implication that defendant failed in some duty to go to the police to initiate an investigation of himself. Rather, it was proper argument relating to the police sergeant's testimony that defendant had volunteered a theory of false accusation in the matter when defendant was not then the subject of an investigation. Should the jury have been inclined to infer that defendant could have disclosed his consent theory to the police from the start, such implication was averted by the trial court's instructions that defendant was presumed innocent and had no obligation to offer a defense, and that the attorneys' comments constituted neither evidence nor authoritative statements of the law. "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Evaluating the prosecutor's comments in context and in light of the record, *Mann*, 288 Mich App at 119, we are convinced that the prosecutor was not commenting on defendant's post-arrest silence, but rather on his pre-arrest history of addressing intrigues relating to the complainant with innocent explanations other than one of consensual sexual relations.

Accordingly, we conclude that no plain error took place in the form of the prosecution's use of post-arrest, post-*Miranda* silence on defendant's part.

## VI. HEARSAY

Defendant argues that he was denied a fair trial when certain witnesses improperly testified that the complainant told them that defendant had "raped" him. The decision whether to admit evidence is within the trial court's discretion and is reviewed on appeal for an abuse of discretion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). Unpreserved evidentiary issues are reviewed for plain error affecting substantial rights. See *People v Pesquera*, 244 Mich App 305, 316; 625 NW2d 407 (2001).

Hearsay, meaning testimony relating a person's unsworn, out-of-court assertions offered to prove the truth of the matter asserted, MRE 801(c), is generally inadmissible, MRE 802, subject to several exemptions and exceptions as provided by the rules of evidence, MRE 801-805.

Defendant argues that Rick Stach, Steve Frank, and Jessica Souva offered improper and damaging hearsay. The first of the transcript pages cited for this argument presents Steve Frank describing the complainant two days after the incident acting strangely quiet. When the prosecutor asked, "in general terms what did he state to you that [defendant] (inaudible) him," Frank answered, "He told me that he forced him to have sex with him." Defense counsel did not respond with an objection. Similarly, the prosecutor asked Rick Stach about the complainant's demeanor after the incident in question and to relay "in general terms" what the complainant said happened. Stach responded that "he [the complainant] said exactly—I was raped" and indicated that defendant had raped him. Again, there was no objection from the defense.

It is apparent from the record that the prosecutor was attempting to comply with defense counsel's prefatory directive to not delve into the specifics of the complainant's statements to Frank and Stach so as to avoid a hearsay objection. Instead the prosecutor was focused on obtaining testimony regarding the complainant's demeanor when describing the incident involving the defendant, which pertained to the complainant's allegations that the sexual encounter entailed rape. Defense counsel's failure to object to the manner in which such testimony was elicited in this instance shows an intentional waiver of any hearsay objection, as defense counsel actively guided the nature of the inquiry, allowed the prosecutor to ask questions necessary to explain what the complainant was upset about when talking to Frank and Stach, and then defense counsel proceeded to strategically cross-examine both Frank and Stach about what they did—or did not do—after speaking with the complainant in an effort to undermine their credibility or question their motives.

To the extent that Stach and Frank repeated the complainant's out-of-court statements as proof that defendant sexually assaulted the complainant, their testimony was inadmissible hearsay. Nevertheless, we deem admission of the testimony to be harmless error because we find no prejudice requiring reversal in light of the entire record. See *People v Smith*, 456 Mich 543, 555; 581 NW2d 654 (1998). "The inquiry into prejudice focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." *Id*. (quotation marks and citation omitted). The complainant had already provided detailed testimony indicating that defendant had sexually assaulted him, and the witnesses' brief

articulation of what the complainant had said occurred in the context of and was secondary to their account of his mental state. In addition, we cannot say that the hearsay testimony necessarily eroded defendant's theory, which was that the sex was consensual. Defendant testified that he initially denied having sex with the complainant because he thought it more appropriate than simply admitting that the two had engaged in sexual activity, and he recounted that the complainant also was concerned about what people would think. This at least raises the question of whether the complainant intended his statements to Stach and Frank to cover any embarrassment about having willingly engaged in sexual activity with defendant. Defendant also offered a plausible explanation of why Stach would spread "his version" about what had happened between the complainant and defendant. Credibility was central to this case, and the record suggests that defendant capably presented his theory at trial. Given the complainant's testimony, witnesses' testimony about the complainant's state of mind days after the alleged sexual assault, and defendant's opportunity to put his various accounts of the contact into a plausible context, we cannot say that the hearsay statements of Stach and Frank so prejudiced defendant as to require reversal of his conviction. See *id*.

Defendant also argues that defense counsel should have objected to "damaging hearsay" when the prosecutor elicited "from another witness that [the complainant] told him how the sex took place between them." However, the transcript citation provided presents Rick Stach not attributing any words to the complainant or anyone else. Rather, it presents defense counsel asking Stach to reconcile the complainant's testimony about saying little to him with Stach's having offered the police a detailed statement. In his exchange with the prosecutor, Stach did not offer hearsay testimony because he did not relay any statement attributed to another person to prove the matter asserted. MCR 801(1)(c).

Jessica Souva described a coworker approaching her "about a situation that a sexual encounter . . . had happened between the defendant and [the complainant]," and her saying to that coworker that she did not know and would have to ask the complainant. Souva then testified that she went to the complainant and asked him about the rumored sexual encounter. Just as she was about to repeat the complainant's response, defense counsel objected to her telling what the complainant said, and the trial court sustained the objection. Souva went on to describe the complainant's emotional state, but she did not purport to repeat any of his words. Again, the testimony challenged on hearsay grounds was not actually hearsay at all.

This issue brings to light minimal testimony attributing statements to another person that bore directly on the key factual question. And because the minimal hearsay actually brought to light only minimally corroborated the complainant's trial testimony, defendant's substantial rights were not affected. *Carines*, 460 Mich at 763; see also *People v McRunels*, 237 Mich App 168, 185; 603 NW2d 95 (1999) (competent testimony that is duplicative of improperly admitted testimony can militate against the conclusion that a party was harmed by the error).

## VII. SYMPATHY, BADGERING, BOLSTERING, AND USE OF "RAPE"

Defendant argues that the prosecutor improperly elicited testimony intended to cause the jurors to feel sympathy for the complainant, invited a witness to credit the complainant's credibility, badgered defendant when he took the stand, and improperly used the word "rape." These concerns relate to the general conduct of trial, which we generally review for an abuse of discretion. See *People v Ramano*, 181 Mich App 204, 220; 448 NW2d 795 (1989). However, to

the extent that the actions engendering these appellate objections drew no objection below, our review is for plain error affecting substantial rights. *Carines*, 460 Mich at 763.

Defendant suggests that the prosecutor elicited testimony from Stach, Frank, and Souva describing the complainant's mood or demeanor after the incident in question to arouse sympathy. Defendant fails to cite authority for the proposition that inquiry regarding a victim's emotions when discussing the subject incident is inappropriate where the prosecution must overcome a theory of consent and the credibility of the complaining witness is at issue. Further, the trial court instructed the jury to base its verdict "only on the evidence and my instructions," and not to "let sympathy or prejudice influence your decision." That instruction is designed to ensure against any inclination by the jurors to attach improper significance to testimony tending to arouse sympathy for the complainant. *Graves*, 458 Mich at 486; see also *People v Petri*, 279 Mich App 407, 414; 760 NW2d 882 (2008) ("instructions are presumed to cure most errors").

Defendant also complains that he was denied a fair trial by the prosecutor's "severe badgering" of defendant on cross-examination. In support of this argument, defendant cites 12 pages of trial transcript, but does not specify precisely what in those 12 pages actually constituted badgering. We decline to scrutinize those 12 pages for indications that might support defendant's argument. "A party may not merely state a position and then leave it to this Court to discover and rationalize the basis for the claim." *Mackle*, 241 Mich App at 604 n 4.

Defendant also argues that the trial court erred by allowing Stach to state, over objection, that he believed the complainant was telling the truth about defendant raping him. "It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). The exchange at issue took place on re-direct examination:

> *Q*. So the defendant acknowledged being there and doing something to [the complainant]? He acknowledged having a sexual interaction with [the complainant]?
>
> *A*. Yes.
>
> *Q*. Okay, go back and tell me. I think counsel asked you, do you think that [the complainant] was lying about something that happened. Do you think that he was lying about being raped that night?
>
> *A*. No I don't.
>
> [DEFENSE COUNSEL]: Judge I'm gonna object because that calls for speculation on behalf of . . . Mr. Stach.
>
> [THE COURT]: I don't believe he asked him if he was lying about being raped. He asked him if he lied about what he told—how he testified yesterday and what he told him. So the extent of what he told him. So the question doesn't accurately reflect what [the complainant] said. Or what, what he cross-examined in.

[THE PROSECUTOR]: Okay.

Defendant is correct that the prosecutor should not have asked Stach if he thought the complainant was lying about being raped. Although defense counsel raised a delayed and different objection, one based on the fact that Stach would have to speculate or guess, rather than rely on known facts about the question being asked, even that objection should have been sustained. But after the trial court weighed in on its impression that the question was not asking whether the complainant was lying, the prosecutor dropped the matter immediately and moved onto other issues. Any damage from improper witness bolstering was minimal and not enough to prejudice the outcome. *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

Defendant additionally argues that he suffered great prejudice through frequent use of the word "rape" to describe the allegations against him, on the ground that "rape" is a common-law concept not perfectly comporting with the statutory criminal sexual conduct actually at issue. We find this argument unpersuasive. The contexts of all references to "rape" in the trial court show that the term was consistently used in the everyday sense of forced sexual activity, with no references to such outdated common-law concepts as that "rape" could not take place if the offender did not ejaculate, or if the victim was the offender's wife. Further, the trial court properly instructed the jury on the elements of first-degree CSC. For these reasons, we conclude that no plain error occurred.

## VIII. ASSISTANCE OF COUNSEL

Defendant asserts that his trial counsel was ineffective for failing to preserve several of the foregoing claims of error by appropriate objection in the trial court.

To establish an ineffective assistance of counsel claim, a defendant must show: (1) that counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). A defendant pressing a claim of ineffective assistance of counsel must overcome a strong presumption that counsel's tactics were matters of sound trial strategy. *People v Henry*, 239 Mich App 140, 146; 607 NW2d 767 (1999). Where there has been no evidentiary hearing in the trial court to develop a claim of ineffective assistance of counsel,[7] appellate review is limited to mistakes apparent on the existing record. See *People v Cox*, 268 Mich App 440, 453; 709 NW2d 152 (2005).

"Trial counsel is not required to advocate a meritless position." *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000). Accordingly, none of the several unpreserved claims of error that we concluded in our discussions above were entirely without merit can support a claim of ineffective assistance.

---

[7] See *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

The instances of unobjected-to hearsay tending to corroborate the complainant's testimony do not support a claim of ineffective assistance, because a strategic reason to suppress objections is apparent. See *Henry*, 239 Mich App at 146. As noted in Part VI, *supra*, there was only minimal testimony attributing statements to another person that bore directly on the key factual question, the statements were as much volunteered as elicited, and from review of the record it appears that defense counsel intentionally chose not to object in order to pursue follow-up questions that would strategically benefit the defense. For these reasons, we conclude that defendant has failed to bring to light any deficiencies in trial counsel's performance.

## IX. COURT COSTS

Defendant contends that the $600 in court costs assessed against him pursuant to MCL 769.1k is an unconstitutional tax and must be vacated. Statutory interpretation is a question of law calling for review de novo. *Denio*, 454 Mich at 698. This issue comes to the Court unpreserved by a timely objection in the trial court. We review unpreserved issues for plain error affecting substantial rights.

The amended judgment of sentence sets forth defendant's obligation to pay "$136.00 STATE MINIMUM COSTS," along with "$130.00 CRIME VICTIM RIGHTS," and "$600.00 COSTS," for a total of $866. In asking this Court "to vacate the assessment of $600 in court costs . . . pursuant to MCL 769.1k," appellate counsel signals a challenge to only that part of the $866 total.

MCL 769.1k(1)(b)(*iii*) authorizes a court to include as part of a criminal sentence "any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case," and sets forth a list of a court's operational expenses that might thus be considered. In *People v Cameron*, 319 Mich App 215; 900 NW2d 658 (2017), this Court concluded that such court costs constitute a tax, but that the statutory authorization of that tax did not run afoul of our state Constitution's Distinct Statement Clause, Const 1963, art 4, § 32, or separation of powers provision, Const 1963, art 3, § 2. *Cameron*, 319 Mich App at 236. An application for leave to appeal our decision in *Cameron* has been filed in the Michigan Supreme Court, which heard oral arguments on the application in November 2018. Until and unless the Michigan Supreme Court grants leave to appeal and then reverses or modifies our decision, we must follow the rule of law set forth in *Cameron*. MCR 7.215(J)(1). Accordingly, we reject defendant's challenge on constitutional grounds of the assessment of $600 in court costs pursuant to MCL 769.1k.

## X. DEFENDANT'S STANDARD 4 BRIEF

Defendant raises additional issues in a supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.

## A. DEFENDANT'S BOOK

Defendant argues that he was denied a fair trial by the prosecutor's use of a book, written by defendant, in cross-examining defendant at trial. Because there was no objection to the prosecutor's questions, we review this unpreserved issue for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763.

-19-

During cross-examination, after discussion of the Internet communication in which defendant said that he "slapped the sh*t" out of the complainant for reasons unrelated to sexual activity, defendant was testifying that he had little inclination to become angry when the prosecutor questioned him about something defendant had written. The prosecution referred to the writing as a "diary," while defendant insisted it was a "fictional book." The book contained numerous instances of defendant assaulting other people. After substantial questioning about defendant's apparent aggressiveness, the prosecution referenced the writing again in the following exchange:

> *Q*. And you said that you're not an assaultive type person. That you're not intimidating.

> *A*. When I was younger. A long time ago I—me and my friends we'd—

> *Q*. Okay, and if you said that you've knocked somebody's teeth out before with a pair of brass knuckles, that'd be something to—

> *A*. They threw my sisters in a bonfire, yea.

> *Q*. You said that you blasted somebody between their eyes and saw nothing but instant blood. . . . That's something you would have written about.

> *A*. I do believe that I said that was a fictional book I wrote, yea.

> *Q*. But again you want the jury to believe that you did nothing to [the complainant], that although you're bigger than him, you never stood over him and cocked your fist and told him, you're gonna be gay tonight.

> *A*. Absolutely not.

There were no further references to the volume in question. The prosecutor never read directly from it, and did not offer it into evidence.

On appeal, defendant protests that the prosecutor had stated the intention not to offer the book into evidence, but then surprised defendant with it on cross-examination, that the prosecutor mischaracterized the volume as defendant's "diary," and referred to "very violent parts" of that "fictional" book as if reporting "facts," thus injecting facts not properly in evidence.

Despite defendant's protestations of "surprise" in the matter, because prior statements of a witness, whether written or not, need not necessarily themselves be admitted into evidence, see MRE 613(a), and thus do not come under all the strictures concerning the admissibility of evidence, defendant fails to show that it was error for the prosecutor to inquire about defendant's statements in a book in the first instance. Although it was indeed suggestive for the prosecutor to describe the volume in question as defendant's "diary," thus insinuating that it should contain accounts of defendant's actual doings or feelings, defendant himself repeatedly characterized it as a work of fiction, and illustrated the inventiveness therein by speaking of his sisters being thrown into a bonfire. The jurors should thus have ended up with no inclination to suppose that

-20-

the prosecutor's inquiries regarding defendant's remarks in a book actually put additional facts into evidence, but instead should have recognized that the prosecutor used the book only to impeach defendant's accounts of having minimal violent tendencies or attitudes.

Accordingly, we conclude that defendant has failed to bring plain error to light with this issue.

## B. MENTION OF EARLIER IMPRISONMENT

Defendant argues that a witness improperly mentioned that he had earlier been to prison, and the prosecutor then improperly commented on that testimony in closing argument. Defendant neither requested a mistrial nor any other remedy when the witness volunteered on cross-examination that defendant had been to prison, nor objected when the prosecutor touched on that evidentiary particular in closing argument. Therefore, we review this unpreserved issue for plain error affecting substantial rights. *Pesquera*, 244 Mich App at 316. We agree that plain error occurred, but conclude that the errors were not of sufficient severity to result in the conviction of an innocent man or to throw into doubt the integrity of the proceedings. See *Carines*, 460 Mich at 763-764.

The trial court decided in pretrial proceedings that defendant's earlier convictions would not be admitted into evidence. At trial, however, when defense counsel asked the complainant if defendant, in the early stages of allegedly becoming aggressive, had threatened him in any way, the complainant answered, "He had mentioned the fact that he had been in prison and that he knew how to handle guys like me."

Because defense counsel was cross-examining the complainant at the time, counsel could hardly object to the line of questioning. Had defense counsel requested a mistrial, the trial court would have properly denied the motion because generally "an unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial." *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). In this case, defense counsel obviously did not wish to elicit that defendant had been in prison by asking the complainant if defendant had threatened him, and defense counsel apparently took pains not to give that witness an opportunity to repeat or otherwise reiterate the improper subject matter. The mishap thus remained at the level of a minor irregularity of the sort that *Haywood* advises does not warrant the drastic remedy of a mistrial. See also *People v Mosko*, 441 Mich 496, 503; 495 NW2d 534 (1992) (a criminal defendant is entitled to a fair trial, not necessarily a perfect one).

Defendant further protests that the prosecutor improperly commented on the matter in closing argument by remarking: "[The complainant] also told you that the defendant told him I know how to deal with people like you. He also told you how he knew to deal with people like [the complainant]. Where he learned it. So [the complainant] complies." Although the prosecutor did not specify defendant's incarceration, by referring to "where" defendant learned to deal with people like the complainant, the prosecutor likely intended to bring to mind the complainant's revelation that defendant had been in prison. Because the trial court had ruled that defendant's prior incarceration was inadmissible at trial, the prosecutor's reference to it was improper argument.

However, that single passing mention of "where" defendant had learned to deal with people like [the complainant] only minimally reminded the jurors that defendant had been in prison. The prosecutor neither repeated nor otherwise emphasized the matter, and he provided no attendant details. It was error, but not a sufficiently serious one to affect defendant's substantial rights under the presenting circumstances. *Carines*, 460 Mich at 763; *Mosko*, 441 Mich at 503. See also MCL 769.26 ("No judgment or verdict shall be set aside . . . in any criminal case . . . for error as to any matter of . . . procedure, unless . . . it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."); MCR 2.613(A) ("an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice").

Nor was defense counsel ineffective for declining to object when the prosecutor mentioned in closing argument "where" defendant learned to deal with people like the complainant. Raising an objection, and presumably drawing a special curative instruction from the trial court, risked emphasizing the irregularity and having the jurors, despite their instructions, keep that damaging information all the more in their minds throughout their deliberations. This was a situation where suppressing an objection and immediate request for a curative instruction was a legitimate way for defense counsel to minimize the damage. See *People v Henry*, 239 Mich App 140, 146; 607 NW2d 767 (1999).

Defendant further complains that the prosecutor reminded the court at sentencing that defendant had threatened the complainant that "it was gonna happen and he knew how to deal with people like him" and "had learned that from prison." Defendant's concern in this regard is misplaced. A sentencing court is obliged to fashion a sentence based on all the pertinent facts and circumstances, and in doing so may rely on information beyond what would be admissible at trial. See *People v Potrafka*, 140 Mich App 749, 751-752; 366 NW2d 35 (1985); see also MRE 1101(b)(3). The court had defendant's criminal history before it from being asked in the first instance to decide whether to share it with the jury, and it was part of defendant's criminal history duly set forth in the presentence investigation report. That the prosecutor mentioned defendant's prior imprisonment at sentencing thus added nothing to the trial court's understanding of the situation, and put defendant at no disadvantage.

## C. INJECTION OF FACTS NOT IN EVIDENCE

Defendant argues that the prosecutor asked questions while cross-examining him that implied that the prosecutor had personal knowledge about what a witness who could not be produced for trial would say. Although we agree that the prosecutor erred, we do not believe that the error warrants reversal. As previously indicated, we decide prosecutorial misconduct issues on a case-by-case basis, examining the record and evaluating a prosecutor's remarks in context. *Mann*, 288 Mich App at 119.

A prosecutor should not suggest to the jury that he or she has personal knowledge bearing on the case. See *People v Smith*, 158 Mich App 220, 231; 405 NW2d 156 (1987). In the case at bar, the prosecutor suggested in his cross-examination of defendant that he had spoken recently with Natalie Linder and that she had failed to support defendant's version of relevant events. We

agree that the prosecutor endeavored to make up for, or even take advantage of, the unavailability of Linder by questioning defendant in ways that itself implied that the prosecutor was revealing information gleaned from a private communication with her. The prosecutor's line of questioning at least invited the jury to speculate that Linder would have refused to corroborate defendant's theory according to which Rick Stach's distress over the development of a dating relationship between her and defendant prompted him to spread false accusations against defendant. However, the jury heard defense counsel's objection to innuendoes relating to a person not present as a witness, the trial court's statement that the prosecutor was questioning over facts not in evidence, and the prosecutor's agreement to ask different questions. From this, the jury should have understood that it should not give weight to mere implications the prosecutor wove into the questions put to defendant on cross-examination. This is especially so given that the trial court admonished the jury that the statements or questions of the attorneys were not evidence. See *Graves*, 458 Mich at 486; *Petri*, 279 Mich App at 414. For these reasons, the irregularity of which defendant here makes issue does not call for reversal.

## D. JUDICIAL BIAS

Defendant argues that the trial judge erred by not sua sponte recusing himself from this case on the ground that he was marginally involved in earlier criminal proceedings concerning defendant. Because defendant did not seek the judge's recusal or disqualification in the trial court, this issue is unpreserved and our review is for plain error affecting substantial rights. *Carines*, 460 Mich at 763.

A criminal defendant is entitled to a "neutral and detached magistrate." *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996) (quotation marks and citation omitted). "[A] trial judge is presumed to be impartial, and the party asserting partiality has the heavy burden of overcoming that presumption." *People v Wade*, 283 Mich App 462, 470; 771 NW2d 447 (2009). Our Supreme Court has recognized that a judge may be disqualified even in the absence of actual bias in situations giving rise to a serious probability of bias, which can arise where the judge is "enmeshed" in other matters involving a party, or "might have prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decision-maker." *Crampton v Dep't of State*, 395 Mich 347, 351; 235 NW2d 352, 354 (1975).

Defendant informs this Court as follows:

> After I was convicted and in jail, my mother reminded me that in the trial 24 years ago I had that this judge was an attorney for my co-defendant. During this trial, The co-def. tried to back out of a plea-agreement he made w/ the prosecutor. Well his lawyer, Mr. Mack, the Judge in this current case got on the stand & testified against me. Verifying he made the deal

-23-

Defendant's criminal history includes two 1993 convictions of third-degree criminal sexual conduct and a term of imprisonment of 10 to 22½ years,[8] from which defendant was paroled in January 2004. Defendant does not explain why any information the instant trial judge may have provided in relation to a 1993 codefendant's hedging whether to accept a plea offer would have left the trial judge with a conflict of interest, or otherwise any lack of impartiality, relating to this case.

Defendant mentioned this distant crossing of legal paths to the judge at sentencing, following which the judge took the opportunity to offer some reflection and clarification for the record:

> I didn't recall until [defendant mentioned it] my involvement in his ninety three case.[9] Yes I was a witness in his trial but . . . so that the record is clear and we don't have to come back . . . on an order of the Court of Appeals and have a hearing as to my involvement that would further delay any appeal.
>
> I'll make it clear today of what my involvement was in your trial. . . . Your co-defendant was my client. And your co-defendant was interviewed by the police while he was under the influence of either drugs or maybe he was drunk. I happened to be with your co-defendant when . . . the interview was attempted.
>
> The officer understood what I should of [sic] suspected and I was called in to testify as to your co-defendant's condition at that time. I wasn't called in to— and you can get that record. That's what I testified to . . . in your case.

Defendant expresses no disagreement with the judge's account of the extent of their overlapping involvements in the 1993 criminal proceedings.

Defendant cites no authority for the proposition that a judge loses the presumption of impartiality in connection with a case involving a defendant whose interests in an unrelated case decades earlier did not perfectly comport with those of a codefendant for whom the current judge then served as defense counsel. Nor does defendant support his general assertion of a conflict of interest by identifying any particulars from the trial court proceedings in the instant matter that might indicate bias on the part of the judge. Further, defendant's admission that he needed his mother's help in even recognizing the trial judge from proceedings relating to his 1993 convictions underscores that defendant's and the judge's interactions in the matter, adversarial or otherwise, were minimal.

---

[8] This Court affirmed defendant's prior convictions in *People v Guthrie*, unpublished per curiam opinion of the Court of Appeals, issued April 6, 1995 (Docket No. 165789), lv den 450 Mich 955 (1995).

[9] Defendant attaches great significance to the fact that the judge remembered defendant in connection with the 1993 criminal proceedings before sentencing in this case, but we do not share defendant's concerns in this regard.

-24-

For these reasons, defendant has failed to show either plain error or that his substantial rights were affected. See *Carines*, 460 Mich at 763.

## E. LEGAL ADVICE RELATING TO PLEA OFFER

Defendant argues that he was denied the effective assistance of counsel when he turned down a reasonable plea offer in reliance on defense counsel's allegedly faulty advice concerning the legal validity of the charges he was facing. Defendant did not raise this issue in the trial court. We conclude that no evidentiary hearing[10] or other post-trial proceedings[11] would be in order even if we assume, without deciding, the accuracy of defendant's pertinent factual representations.

"Before deciding whether to plead guilty, a defendant is entitled to the effective assistance of competent counsel." *Padilla v Kentucky*, 559 US 356, 364; 130 S Ct 1473; 176 L Ed 2d 284 (2010) (quotation marks and citation omitted). A defense attorney thus has a "critical obligation . . . to advise the client of the advantages and disadvantages of a plea agreement." *Id.* at 370 (quotation marks and citation omitted).

In this case, defendant reports as follows:

> Before trial defendant was offered a 5 to 8 year plea bargain to plead guilty to 3rd degree CSC, and also several other count's [sic] would be dropped. Defense counsel told defendant the judge would agree.

> \* \* \*

> Prior to this, Defendant and his Wife had a meeting w/ defense counsel. Counsel showed them that the 1 count of CSC-1 during commission of a felony . . . will get thrown out at trial because it wasn't a law at the time of this alleged crime . . . . Counsel said he cannot be convicted as a matter of law. . . .

> Defense counsel told defendant and his wife that the second CSC-1 personel [sic] injury . . . count also can[']t be proved because the prosecutor can[']t prove mental anguish and the alleged victim already [sic] testified in the [preliminary examination that] he wasn[']t hurt.

> "<u>Because</u>" of this advice from defense counsel defendant and his wife decided that if he cannot be convicted of these crimes, then agreeing to do 5-8 years in prison would be a very bad idea!

> So defendant declined the plea bargain because of that advice.

---

[10] See *Ginther*, 390 Mich at 443.

[11] See *Lafler v Cooper*, 566 US 156; 132 S Ct 1376; 182 L Ed 2d 398 (2012); *People v McCauley*, 493 Mich 872; 821 NW2d 569 (2012).

Significantly, defendant asserts neither that defense counsel specifically advised him to decline the plea offer out of certainty that no conviction would result from trial, nor that defense counsel assured him that no charges could be drawn from the alleged incident other than the two CSC-I theories that counsel thought legally infirm or factually insufficient.

Further, defense counsel's opinion that the prosecution could not establish penetration during the commission of another felony because there was no statutory unlawful imprisonment at the time relevant was in fact a valid one, now vindicated on appeal. In addition, counsel had a reasonable basis for expressing optimism over being able to defeat the charge of penetration accomplished by force or coercion and causing injury on the ground that the complainant gave minimal indication that he suffered mental anguish.

Nevertheless, if defendant took counsel's expressions of optimism as definite assurances that he would avoid all criminal liability in the matter, the fault lay more with defendant than with his attorney. That the prosecution was proceeding with the charges should have suggested to defendant that defense counsel's doubts concerning the legal validity or evidentiary sufficiency underlying the theories of first-degree CSC were strategic ruminations, as opposed to black-letter law. And because defendant was offered the opportunity to plead guilty to third-degree CSC, defendant had notice that even if the theories of first-degree CSC failed, the prosecution could still resort to a theory of third-degree CSC in order to secure a conviction. Thus, in our view, defendant does not describe incorrect legal information that reasonably induced him to eschew a plea offer, but sound legal opinions that should properly have factored into his personal choice whether to accept the plea offer or gamble on his prospects of acquittal after trial. See MRPC 1.2(a) ("the lawyer shall abide by the client's decision, after consultation with the lawyer, with respect to a plea to be entered").

For these reasons, defendant has failed to bring a deficiency in defense counsel's performance to light.

## XI. CONCLUSION

For the reasons stated, we affirm defendant's conviction of first-degree criminal sexual conduct under MCL 750.520b(1)(f), but vacate the conviction under MCL 750.520b(1)(c), and remand this case to the trial court for resentencing as informed by a guidelines recommendation adjusted to reflect a score of zero points for OV 7.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jane M. Beckering

-26-